In re TOOLE et al.

Petition and Appeal of FOSTER.

(Circuit Court of Appeals, Second Circuit. March 16, 1921.)

No. 66.

1. **Bankruptcy** ⬅️140(3)—**Evidence held not to show indebtedness to customer whose securities had been repledged.**

In reclamation proceedings against the receiver of bankrupt brokers to recover securities pledged with the brokers to protect petitioner's margin, evidence that on the day of the bankruptcy the indebtedness of the petitioner to the brokers was less than the value of securities of the customer in the hands of the brokers, aside from those in controversy, does not show that the petitioner was a creditor, and not a debtor, of the brokers, or was entitled to a delivery of the securities, since the brokers could hold all securities until the account against petitioner was paid in full.

2. **Brokers** ⬅️23—**Can repledge securities pledged with them by margin trader.**

In the absence of an agreement that they will not do so, stockbrokers have the right to repledge collateral deposited with them to secure advances on margin transactions.

3. **Brokers** ⬅️23—**Parol agreement not to repledge securities held superseded by subsequent written agreement.**

A parol agreement by a broker to keep in his vault securities pledged by a customer to cover advances in margin transactions, which was made before the brokerage firm was formed or the customer's account opened, was superseded by a subsequent agreement with the firm permitting the brokers to repledge the securities pledged with them by the customer.

4. **Bankruptcy** ⬅️140(3)—**Brokers' customers, whose lawfully repledged securities were sold, are entitled to contribution from those whose securities were not sold.**

Where a brokerage firm lawfully repledged securities pledged with them by their customers, and after the bankruptcy of the brokers the subsequent pledgee sold a portion of the securities to satisfy its debt and returned the others to the receiver in bankruptcy, the owners of the securities which were sold are entitled to contribution from those whose securities were returned, though they would not be so entitled if the returned securities had been unlawfully repledged, and therefore the owner of the securities which were returned cannot reclaim them from the receiver in bankruptcy.

5. **Bankruptcy** ⬅️140(3)—**Right to contribution between brokers' customers, whose stock was repledged, is not affected by customers' knowledge.**

The right to contribution between customers of a bankrupt brokerage firm whose securities had been lawfully repledged by the brokers is not affected by the knowledge or ignorance of the parties of each other's engagements.

Manton, Circuit Judge, dissenting.

⬅️For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Petition to Revise and Appeal from an Order of the District Court of the United States for the Southern District of New York.

Proceeding in bankruptcy against Charles B. Toole and Douglas Henry, individually and as copartners trading under the firm name and style of Toole, Henry & Co. Petition by Mark P. Foster for reclamation of certain bonds deposited as collateral security with the bankrupts was denied, and Foster petitions to revise and appeals. Affirmed.

See, also, 270 Fed. 195.

It appears that Toole, Henry & Co. were engaged in business as stockbrokers and members of the New York Stock Exchange in the city of New York. On April 2, 1919, an involuntary petition in bankruptcy was filed in the United States District Court for the Southern District of New York praying that Toole, Henry & Co. be adjudged involuntary bankrupts. They were so adjudged, and Edwards H. Childs was appointed temporary receiver, May 8, 1919, a petition was filed by Mark P. Foster in the District Court aforesaid, praying for the immediate delivery to him by the receiver of 47 Green Bay & Western debenture B bonds, which were in the receiver's possession, but which the petitioner claimed that he was entitled to the immediate possession of as owner.

It appears that in June, 1917, Foster had delivered to Toole, Henry & Co., 67 Green Bay & Western debenture B bonds as security on a margin account, which was to be carried in his name with the bankrupts. After the petition in bankruptcy was filed, Foster made an investigation and ascertained that of the original 67 bonds deposited by him with the bankrupts 20 had been sold, 46 had been pledged to Levy Bros., engaged in a similar line of business as that of the bankrupts, along with a number of other securities which belonged to other customers of Toole, Henry & Co., as collateral security for a loan made by Levy Bros. to the bankrupts, and that 1 of said bonds was still in the vaults of the latter. On April 3 and 4, 1919, and other days immediately following the filing of the petition in bankruptcy, Levy Bros. proceeded to dispose of the various securities deposited with them, until they had reobtained the money advanced by them to the bankrupts, returning the excess securities and a sum of money to the receiver. They did not dispose of the 46 bonds belonging to Foster, but returned them to the receiver, who was and now is in possession thereof, together with the 1 bond that had never left the vault of Toole, Henry & Co.

It is conceded, and it is not open to dispute, that on the date of the filing of the petition in bankruptcy the margin account of Foster showed that his debit balance was $198,802.79, and that against that debit balance Toole, Henry & Co. had purchased for him and was carrying securities, exclusive of the Green Bay bonds, of the then market value of $219,420.62. Foster, claiming that the Green Bay bonds had been specially deposited to secure Toole, Henry & Co. against any loss on his margin account, brought reclamation proceedings to recover the 47 bonds from the receiver. The receiver offered to return the 1 bond which had remained in the vaults of the bankrupts, which offer was refused. Upon the hearing on the reclamation proceeding, the court determined that Foster was entitled to the delivery of said bonds, and on the 13th day of May entered an order requiring the receiver to turn over to the petitioner the 47 bonds in question. Upon a rehearing, the court stayed the order pending a hearing and determination upon an application made by the receiver to vacate and set aside the order, and thereupon entered an order referring the proceedings to the referee for his determination and adjudication. Hearings were duly had by the referee, at the conclusion of which he determined that Foster was not entitled to the delivery of the 46 Green Bay & Western debenture B bonds, but that he must share with the other creditors upon equal basis in the ultimate funds realized from the sale of the remaining securities redelivered to the receiver by Levy Bros. after the satisfaction of their debt. The report of the referee was confirmed by the District Court, and from the order confirming said report this appeal is taken.

Zalkin & Cohen, of New York City (Harry Zalkin and Nathan Coplan, both of New York City, of counsel), for respondent.

Paskus, Gordon & Hyman, of New York City (Arthur B. Hyman and Leopold Bleich, of New York City, of counsel), for petitioner.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). The petitioner, Mark P. Foster, has brought this reclamation proceeding to recover possession of certain bonds which he had deposited as collateral security with his brokers, Toole, Henry & Co., the bankrupts, and which the latter in turn pledged to Levy Bros. along with the securities of other of their customers, to secure the repayment of a loan made by Levy Bros. to the bankrupts. It appears that Levy Bros. after the bankruptcy sold the securities of the other customers so pledged with them, but did not sell the Foster bonds. Those bonds were returned to the receiver of the bankrupts, together with $4,236.64 in cash. The question which arises is whether under these circumstances Foster is entitled to the return of the bonds, which it is admitted the receivers now hold, and which it is also admitted that Foster has identified by specific bond numbers, or whether the owners of the other securities which Toole, Henry & Co. pledged with Levy Bros., and which the latter sold, have any equitable rights in the Foster bonds by way of contribution.

At the time the receiver took possession he found 1 of the 47 Green Bay bonds, which the petitioner is demanding, in the "box" of Toole, Henry & Co. The referee determined that Foster is certainly entitled to the reclamation of that bond. In that opinion the District Judge concurred, and the soundness of that conclusion is not questioned in this case. The order which we are asked to review and revise is that made on June 26, 1919. It directed that Foster's petition be consolidated with the order of May 10, 1919, which referred all claims arising out of the Levy Bros. loan fund to the referee "for determination in the omnibus proceeding now pending against the Levy fund, to be determined in accordance with the rights and equities of those similarly situated as said Foster."

The petition asserts two grounds of error:

"(1) The failure of the court's order to direct the delivery of all 47 bonds to Foster.

"(2) Because the order directs that Foster 'must share in the ultimate funds with the other creditors as to the remaining 46 bonds on equal terms.'"

As respects the second of these objections, it is to be observed that all that the order objected to provides is that the determination is to be "in accordance with the rights and equities of those similarly situated as said Foster." So that, unless there are other creditors similarly situated, Foster cannot be prejudiced, and, if there are other creditors similarly situated, the rights of Foster cannot be higher than theirs.

[1] In his petition Foster, the customer, alleges that on the day on which the involuntary petition in bankruptcy was filed against the broker there was a credit balance in the petitioner's favor in excess of $20,000, on the account carried in his name on the books of the bank-

rupts. It appears, however, by Foster's own testimony that the debit charge against him on the bankrupts' book was $198,000, and that the market value of all of his securities, including the bonds now sought to be reclaimed, was at that time $230,000. As a stockbroker has a lien on the securities of his principal for the unpaid balance of any advances which the broker has made for his customer, it follows that Toole, Henry & Co. on the day prior to the bankruptcy were under no obligation to turn over the Green Bay bonds or any of the other securities to Foster, unless he had then and there tendered payment to them of his indebtedness of $198,802.79. It cannot, therefore, be said that the brokers were indebted to Foster on the day prior to their bankruptcy in the sum of $20,000, or in any other amount.

[2, 3] As Foster was a margin trader, Toole, Henry & Co., in the absence of an agreement that they would not do so, had the right to repledge collateral deposited with them to secure advances on margin transactions. In re Ennis, 187 Fed. 720, 109 C. C. A. 468; German Savings Bank v. Renshaw, 78 Md. 475, 28 Atl. 281; Furber v. Dane, 203 Mass. 108, 89 N. E. 227. Foster asserts that some time in 1916, and prior to the time when Toole, Henry & Co. had begun business, he had a conversation with Toole, who informed him of his plans, and wanted him to do his business through his firm, and told him that he would carry these bonds as security on marginal transactions and that "he would always keep these bonds in the vault." This alleged conversation was months before the firm was formed, and months prior to the delivery of the bonds by Foster to the brokers, which did not occur until June, 1917. Prior to this transfer of the bonds Foster had transacted his business through Willison & Co. He closed his account with that firm at the time these bonds were delivered to Toole, Henry & Co., and the delivery of the bonds was made by Willison & Co., when Foster closed his account with that firm. Prior to that Foster had transacted no business with Toole, Henry & Co.

We assume that the conversation already quoted, which Foster alleges took place between himself and Toole in 1916, actually occurred. But it appears that in January, 1919, Toole, Henry & Co. mailed to Foster a card, requesting him to sign the same and return it. He admits receiving, signing, and mailing it back. The card read as follows:

"Toole, Henry & Co., 120 Broadway, New York.

"Telephone, Rector 7870.

"The undersigned hereby understands and agrees that on all marginal business the right is reserved by you to close transactions where margins are running out without further notice, and to settle contracts in accordance with the rules and customs of the New York Stock Exchange and its clearing house, or on the curb or the exchange where order was executed, and that all securities, from time to time, carried upon my marginal account or deposited to protect the same, may be loaned or pledged by you, either separately or together with other securities, either for the sum due thereon or for a greater sum all without further notice, and that all transactions are subject to the rules and customs of the New York Stock Exchange and its clearing house or the curb or other exchange where order was executed.

"Sign full name, not merely initials.          Mark P. Foster."

The parol agreement of 1916 above referred to was clearly superseded by the written authorization that all securities might be loaned or

pledged by Toole, Henry & Co. Thereafter the brokers pledged the Green Bay bonds with Levy Bros. and did so lawfully.

This brings us to inquire as to the law applicable to such a state of facts as exist in this case. The case of In re T. A. McIntyre & Co., 181 Fed. 955, 104 C. C. A. 419, decided by this court in 1910, must be referred to in detail, as we regard it as of controlling importance. It has been sometimes referred to as Pippey's Case. The facts in that case as respects Pippey were as follows: The firm of T. A. McIntyre & Co. had been engaged in the general brokerage business. On April 24, 1908, an involuntary petition in bankruptcy was filed against it and receivers were appointed. Adjudication followed on May 21, 1908. On March 4, 1907, McIntyre & Co. borrowed from the Metropolitan Trust Company $200,000 and deposited as collateral therefor a large number of stocks and bonds. The day prior to the filing of the petition in bankruptcy McIntyre & Co. pledged with the Trust Company, as a substituted collateral security for the loan of $200,000, 18 shares of Pullman Company common stock owned by Pippey and standing in his name, being certificate No. 10,277. Pippey had indorsed a transfer in blank on the certificate and delivered it to McIntyre & Co. as security for transactions thereafter to be had between them, no authority to repledge being given. On the day after the petition in bankruptcy was filed against McIntyre & Co., Pippey demanded his stock from the receiver of that company and was informed it was in the possession of the Trust Company. On August 30th he demanded it from the Trust Company and directed them not to sell the same. Various steps were taken by Pippey to recover the stock, which are set forth in the court's opinion, but which it is not important to repeat in this connection. It is sufficient for the present purpose to say that on April 24, 1908, the day on which the petition in bankruptcy was filed, the Trust Company applied $70,000 toward the payment of the $200,000, reducing the principal thereby to $130,000, and thereafter the Trust Company sold securities from time to time, applying the proceeds to the reduction of the debt. On May 6th the company had liquidated its claim of $200,-000 out of the securities sold, and still held Pippey's certificate No. 10,277 for the 18 shares of the Pullman stock, as well as a cash credit of $832.16 to the estate in bankruptcy, and certain securities. The task was to determine the rights of the various claimants to this balance of cash and various shares of stock, which by order of the court had been redeposited in the Metropolitan Trust to remain there subject to the court's order.

The court below, after referring the matter to a master to hear and determine, ordered Pippey's Pullman stock to be sold and the proceeds put into a fund with the proceeds of the various other securities and the cash item of $832.16 above referred to, and directed that Pippey should share with others whose stock was improperly pledged by the brokers with the Trust Company and sold by it. This was practically applying the principle of general average to the situation. As this court observed when the case came before it:

"The pledge is treated as a common adventure, the securities sold as a sacrifice for the common benefit, to which all interests are required to contribute."

This court held that Pippey could not be thus required to contribute, and so much of the order as related to Pippey's stock was reversed, and the cause remanded, with instructions to direct the trustee to return his stock to him, or, if it had been sold, to turn the proceeds over to him. This court in the course of its opinion pointed out that McIntyre & Co. had no right to pledge Pippey's stock for any of its own debts, as the stock had been deposited with the firm merely as security against any losses from transactions on the market for Pippey's account. When it did pledge them the day before its failure, "the firm had no transaction pending and was itself indebted to Pippey. This was a larceny of his stock." This court said:

"By reason of the circumstances that when he left the certificate with the brokers it was duly indorsed with a transfer in blank executed by himself, he exposed himself to risk of losing his stock if the person to whom it was pledged, in good faith, for a valuable consideration, found it necessary to sell it in order to secure payment of his advances. That would be solely because Pippey would be estopped from asserting his title against the person who had parted with value on the faith of the transfer he had signed. But the pledgee has not found it necessary to sell the Pullman stock. It has repaid itself from other items of the pledged property. It no longer has any lien on such property. It can no longer avail of any doctrine of estoppel. Pippey's title to his stock is absolute. He is entitled to the certificate which represents that title. The trustees, in the language of the United States Supreme Court, 'have no better right in [it] than the bankrupt.' Thomas v. Taggart, 209 U. S. 385, 28 Sup. Ct. 519, 52 L. Ed. 845."

In the same case this court determined the claim of Mrs. Hudson, which differed in an important particular from that of Pippey's. Her stock had also been pledged with McIntyre & Co., and had been by it turned over to the Trust Company, and was not sold by that company, but was among the securities turned over to the estate in bankruptcy after the company had liquidated its claim of $200,000 against McIntyre & Co. by the sale of other securities. Mrs. Hudson had not deposited her stock with McIntyre & Co. as security for transactions on her account, but had loaned it to the firm for use in its business; it being agreed, however, that the stock was to continue her property, and was to remain on the books in her name, and that the dividends were to be paid to her. This court held that as respects this stock it was not unlawfully pledged, and as it had not been sold it was bound to contribute to the payment of the loan for which it was pledged. In other words, equity will treat alike those similarly situated. As respects Pippey no one was similarly situated, and consequently there was no obligation of contribution. As respects Mrs. Hudson there were others who, like her, had consented that their stock might be similarly hypothecated, and as to them there was the obligation of contribution resting upon her.

The case of In re J. C. Wilson, 252 Fed. 631, in the District Court for the Southern District of New York in 1917, received careful consideration at the hands of the Judge who decided it. It involved an interesting question not passed upon in the McIntyre Case. On July 30, 1914, the brokerage firm of Wilson & Co. held for one Rolph 300 shares of Mexican Petroleum stock which had been paid for in full. The brokers without authority hypothecated these shares with Harris,

Winthrop & Co. There were other securities which Wilson & Co. also hypothecated without right with Harris, Winthrop & Co. After Wilson & Co. had been adjudicated bankrupts, Harris, Winthrop & Co. sold certain of the securities which Wilson & Co. had also wrongly hypothecated, but did not sell the Rolph stock, which, as we have said, was wrongfully hypothecated' but which survived the liquidation. Rolph claimed, relying on the decision as to Pippey's stock in the McIntyre Case, that he was entitled to reclaim the identical 300 shares of his stock, but the court thought that the mere accident that Rolph's 300 shares survived liquidation did not give him equities superior to others whose stock had been unlawfully hypothecated with Winthrop & Co. by Wilson & Co. and sold by Winthrop & Co. to discharge their debt against Wilson & Co. In the course of the opinion of the District Judge, referring to the decision as to Pippey's stock in the McIntyre Case, it was said:

"It is true that the court held that the admiralty principle of general average was not applicable, and that the pledge should not be treated as a common adventure; but it did not disturb the proposition that it is the character of the equity which determines how any particular claim shall be classified. The case is quite different from one where a pledgee rightly sells collateral prior to a bankruptcy. In the absence of fraud or collusive arrangements, the result of such a sale is one of the hazards which may befall persons in a business of this character. If, however, it be held that, after a petition in bankruptcy has been filed, the pledgee, by selecting for sale some stocks and not others, can thereby save some stocks intact for the owners without the burden of contribution, and not others, it can readily be seen that the door will be opened for the most indefensible kind of favoritism, and possibly for corrupt bargains between the owners of securities and the pledgee. Indeed, a pledgee of his own motion, without any agreement with owners of securities, could easily safeguard his friends, to the detriment of others who were strangers to him. I am fully satisfied, therefore, that Rolph is in the same position as other class A claimants."

[4] We think the conclusion above reached was correct, and that the adoption of the contrary theory would lead many times to unfair practices and work gross injustice. The courts in the United States and England have long acted upon the principle that between different creditors equality is equity. Equality, according to Bracton, constitutes equity itself. All debts are generally deemed by courts of equity to stand in pari jure and are to be paid proportionally. In the case of stock unlawfully pledged and belonging to different owners, the equities are originally equal, and that equality is not disturbed by the fact that the stock of one is sold by the pledgee, while that of the other survives. So the principle of general average applied in maritime and commercial operations, and which required a general contribution to be made by all parties in interest towards a loss which is voluntarily incurred for the benefit of all, is indicative of the rule which should be applied in a case like this. The principle upon which contribution is founded does not rest upon contract but has its origin in natural law. Story's Equity Jurisprudence, vol. 1, § 490.

In Johnson v. Bixby, 252 Fed. 103, 64 C. C. A. 215, 1 A. L. R. 660, the Circuit Court of Appeals for the Eighth Circuit held that, where shares of stock deposited by customers with a brokerage partnership

were before bankruptcy of the partnership wrongfully pledged by it to secure its indebtedness to an innocent pledgee, and after bankruptcy the pledgee sold enough of the stock of customers A and B to pay the indebtedness, and thereafter, in addition, sold the stock of customer C. and the proceeds of that sale were traced intact into the bankrupt's assets, C was entitled to reclaim the same without contribution as to customers A and B. In the opinion the court said:

"As to contribution, the pledgee had a right to sell the Johnson and the Schoellhorn stock and apply the proceeds, because such action was necessary to pay its debt. So far as this record shows, the other collateral sold that day belonged to the bankrupt. The balance of such proceeds after payment was, so far as the pledgee was concerned, due the pledgor. But as it sprang from stock wrongfully pledged, and can be traced by the owners of that stock, it may be made subject to their superior rights. It is the only fund that can be so followed by them. This measures the maximum residue of their converted property which can be legally identified. The then unsold collateral (including the Bixby stock) was not in æquali jure with the proceeds of the prior sales. This collateral was burdened with no obligation of contribution. It was at that time freed from the pledge. No such obligation originated in the mere fact of a subsequent wrongful sale by the pledgee. No part of the proceeds of the Bixby stock was, or, under the circumstances, could properly be, applied to the debt. The entire proceeds of that sale remain intact, and can be traced. The mere fact that such were transmitted to the trustee in a common sum or payment with the above balance does not lessen Bixby's right therein. It does not create a right in Johnson or Schoellhorn to any part thereof."

In the above case the customers A, B, and C apparently stood in exactly the same relation to the hypothecating bankrupt. The lender who held the collateral paid himself by selling out the stock of A and B. He then sold out C's stock and paid over the proceeds to the receiver of the bankrupt. If we are right in understanding that A, B, and C stood in the same relation, and that the stock of each had been wrongfully pledged, then in holding that C was entitled, without contribution, to recover in solido the entire proceeds realized from the sale of his stock the court did not apply the principle intended to be announced in the McIntyre Case, and which was more fully set forth and applied in the case of In re Wilson. The doctrine of the Johnson Case is inconsistent with that announced in the McIntyre Case and in that of In re Wilson, which we prefer.

[5] We think that, when customers authorize their broker to pledge their securities for the payment of the broker's debts, each becomes to the extent of his pledge a surety for the payment of such indebtedness. As between themselves they become cosureties. All the collateral lawfully so pledged is subject to the same obligation and lien. The owners of the collateral, being in effect cosureties, must be entitled to contribution from each other for any loss sustained if the stock of one is sold to pay the debt for which the stock of the other was equally liable. This right of contribution does not arise from the contract, as already said, but rests upon principles of equity and natural justice. The principle is that where all are equally liable for the payment of a debt all are bound equally to contribute to that purpose. So that if the stock of A, B, and C is lawfully pledged for the payment of the debt of X, the stock of each is under the common burden, and if X sells the stock

of A and B, and leaves unsold the stock of C, the latter must contribute to A and B the excess they have paid above their share. But if, on the other hand, the stock of A is lawfully pledged, while that of B and C is unlawfully pledged, there is no obligation on the part of B and C to contribute, for there is no common burden as between A, on the one side, and B and C, on the other. The principle applies only in cases where the situations of the parties are equal as equality among persons whose situations are not equal is not equitable. The situations are equal when the parties are under a common burden. Screven v. Joyner, 1 Hill, Eq. (S. C.) 252, 26 Am. Dec. 199. It is immaterial whether the parties knew of each other's engagements or not. Durbin v. Kuney, 19 Or. 71, 23 Pac. 661.

In conclusion, it is to be observed that the order which we are asked to revise does not determine that Foster is not entitled to the return of the entire 47 bonds which he claims. Upon the testimony which appears in this record it is impossible to say whether or not he is entitled to them. It has not been disclosed under what circumstances the securities of the other creditors were pledged by the bankrupts, whether it was done lawfully or unlawfully. The order simply contemplates that the facts shall be ascertained, so that it may be seen whether there are other creditors similarly situated with Foster. If so, his rights cannot be superior to theirs.

The order is affirmed.

MANTON, Circuit Judge (dissenting). When Toole, Henry & Co. failed, they had the bonds in question, deposited under an agreement which, among other things, contained the following:

"The undersigned hereby understands and agrees that on all marginal business the right is reserved by you to close transactions where margins are running out without further notice, and to settle contracts in accordance with the rules and customs of the New York Stock Exchange and its clearing house, or on the curb or the exchange where order was executed, and that all securities, from time to time, carried upon my marginal account or deposited to protect the same, may be loaned or pledged by you, either separately or together with other securities, either for the sum due thereon or for a greater sum, all without further notice, and that all transactions are subject to the rules and customs of the New York Stock Exchange and its clearing house or the curb or other exchange where order was executed."

When the petition in bankruptcy was filed on April 2, 1919, the 46 bonds were pledged to Levy Bros., who were stockbrokers, together with other securities, as collateral for a loan made by them to the bankrupts. After filing the petition in bankruptcy, Levy Bros. proceeded to dispose of the various securities deposited with them as collateral for the loan and thus obtained payment of the indebtedness of Toole, Henry & Co. They returned such securities as they did not sell to the receiver, and he now has the 46 bonds in question belonging to the petitioner. It is claimed that these bonds must be sold, and that the funds received by the receiver on such sale should be paid to the other creditors whose bonds were hypothecated by the bankrupts with Levy Bros. and subsequently sold. The result in the District Court was reached on the authority of In re Wilson & Co. (D. C.) 252 Fed. 638.

If this court adopts the rule there laid down, there is no error in the result below. But I cannot agree that the rule laid down by the District Court in the Wilson Case finds support from other authorities, or is a rule which should be adopted by this court in this case. This litigation is between the receiver and the creditors of stockbrokers whose securities have survived the liquidation. The respective rights of the receiver and the claimant must be adjudged by the terms under which the bonds were pledged with the bankrupts. The referee has found as a fact that at the date of sale, the accounts of the bankrupts showed that the claimant was a creditor of the bankrupts for approximately $20,000. When the bonds were used by the bankrupts in pledging them with Levy Bros., they were not securing any indebtedness of Foster to the bankrupts and in using the bonds by pledging them, the bankrupts committed a wrong, for if, on the day when the pledge of the bonds was made to Levy Bros., the claimant had insisted upon closing his account with the bankrupts, he not only would have had the return of his bonds, but $20,000 due and payable in cash to close his account. The fact that the contract under which the bonds were deposited as security with the bankrupts authorized the bankrupts from time to time to pledge the bonds to protect the account of the claimant, and to loan or pledge them either separately or together with other securities, "either for the sum due thereon or for a greater sum all without further notice," should not be construed as a general authority in the bankrupts to convert the bonds to their own use and to pledge them for some obligation other than the obligations which the claimant might owe to the bankrupts. What the bankrupts did in pledging the securities with Levy Bros. was tantamount to a theft of the same, if they were used for purposes other than those which were authorized by the contract of pledge. In Thomas v. Taggart, 209 U. S. 385, 28 Sup. Ct. 519, 52 L. Ed. 845, the court said:

"The rule is generally recognized that, if the title to property claimed is good as against the bankrupt and his creditors at the time the trustee's title accrued, the title does not pass and the property should be restored to its true owner, or, if the property has been sold, the proceeds of the sale takes the place of the property."

The court held further that the shares of stock held by a broker as collateral for the account of a customer, upon which the latter is indebted to the broker, are the property of the customer and as a trustee has no better right thereto than the bankrupt, the customer is entitled to their possession, and this right is not affected by the fact that the broker has hypothecated the shares. In such a case, the customer is entitled to the shares or their proceeds when returned to the trustee, and the court further held that the customer is entitled to the shares or their proceeds when returned to the trustee if the loan had been paid by the proceeds of other securities pledged therefor.

This court said in Re T. A. McIntyre & Co., 181 Fed. 955, 104 C. C. A. 419, in a similar transaction, where stock was improperly pledged by the brokers with a trust company to secure a loan and subsequently sold in satisfaction of that loan, and where the lower court made about the same disposition as it made in the case at bar:

"This is practically applying the principle of general average to the situation. The pledge is treated as a common adventure, the securities sold as a sacrifice for the common benefit, to which all interests are required to contribute. We do not think Pippey can be thus required to contribute. If he had been left undisturbed to prosecute the replevin suit, he would have recovered the specific piece of property, which he owned, had identified, and was entitled to. By not appealing from the original order, and by prosecuting his claim of his stock in the bankruptcy court, he did not abandon any of his legal rights, nor obligate himself to contribute to the reimbursement of any one whose stock had been sold."

Where shares of stock deposited by customers with a brokerage partnership were, before bankruptcy of the partnership, wrongfully pledged by it to secure its indebtedness to an innocent pledgee, and after bankruptcy, the pledgee sold enough of the stock of other customers to pay the indebtedness, and thereafter, in addition, sold stock of the claimant, the latter, the proceeds of the sale of whose stock were traceable intact into bankrupt's assets, was entitled thereto without contribution as to the other customers. C. C. A. Eighth Circuit, Johnson v. Bixby, 252 Fed. 103, 64 C. C. A. 215, 1 A. L. R. 660.

Here the claimant's stock was not sold to satisfy the debt of Levy Bros. It had been wrongfully pledged when the claimant was a creditor of the bankrupt. There was no authority to pledge it under the circumstances. The agreement petitioner signed with the bankrupts did not authorize it. The bankrupts had no right or title to the stock and at no time were they holding it for any other reason than as collateral security to protect them against the failure of the claimant to answer any call for margins on his purchases.

Under these circumstances, I think the claimant was entitled to an order directing delivery of the bonds to him.