### BEAVER BOARDS CO. v. IMBRIE & CO. (LYNCH, Intervener.)

(District Court, N. D. Georgia. July 18, 1922.)

1. **Brokers ⊜=23—Cannot use money or stocks deposited by customer for their own independent purposes.**

   While a deposit of stocks or money with a broker by a customer ordinarily carries the right to use them in forwarding the customer's business, this right does not extend to their use by the broker for his own independent purposes.

2. **Brokers ⊜=23—Money deposited by customer held security, and in equity the property of the customer.**

   A broker's right to use stocks or money deposited by a customer cannot prevail against an express agreement to the contrary, and where a check was delivered to brokers, to be held until the customer's account was closed, the money, if not the check, was security for the final settlement, and in equity, at least, the ownership remained with the customer.

3. **Trusts ⊜=349—Where money deposited with broker as security was exchanged for bonds, and later for stock, customer, on receivership, entitled to follow fund.**

   Where money deposited with a broker's branch office as security was treated as a special fund, and while such fund was still identifiable was withdrawn by the main office by draft, and bonds put in its place, and later other securities substituted therefor, some of which came into the

hands of the broker's receivers, the customer was entitled to follow the money as a trust ex maleficio, in the absence of any intervening rights of bona fide purchasers or lienors.

4. **Trusts ⬤⟳358(1)—Broker's customer not entitled to preference respecting so much of trust fund as could not be identified.**

   A customer, depositing money with brokers as security, has no superior right, on receivership, for so much of the fund deposited as cannot be traced into the fund in court.

5. **Receivers ⬤⟳209—Court exercising ancillary jurisdiction may adjudicate claims to property in ancillary receiver's hands.**

   A court exercising ancillary jurisdiction in connection with a receivership may adjudicate a claim to title to, or an equitable interest in, specific shares of stock coming into the ancillary receiver's hands.

6. **Equity ⬤⟳288—One asserting title to money in receiver's hands must amend, in order to follow fund into stock.**

   An intervener, asserting title to money in the hands of a receiver, which he fails to prove, must amend his pleadings, in order to assert rights against stock in the hands of the receiver, into which his money can be traced.

In Equity. Receivership suit by the Beaver Boards Companies against Imbrie & Co., in which S. A. Lynch intervened, and claimed property in the hands of the receiver. On exceptions to the master's report. Exceptions sustained in part, with leave to amend.

The issue as stated by the master was whether $10,000, paid by the intervener to Imbrie & Co., was a trust fund. Imbrie & Co. were brokers, having their principal office in New York, and a branch office in Atlanta. The intervener gave the Atlanta office a check for $10,000 to protect Imbrie & Co. against losses on certain transactions which were to follow in certain stock, accompanied by a letter, the material part of which is quoted in the opinion. The making of this deposit was reported by the Atlanta office to the New York office, and the New York office drew a draft on the Atlanta office for $9,500, attaching certain bonds to the draft, and directed the Atlanta office to use the intervener's deposit in taking up the draft. Thereafter, by means of other drafts, other bonds, and later stock was substituted for the bonds in question, and 200 shares of such stock passed into the possession of the receivers. As conclusions of law the master held that this $10,000 was a trust fund, and that, Imbrie & Co. having substituted bonds for $9,500 of such trust fund, and later other bonds, and still later such stock, the intervener was entitled to an equitable lien and preferential payment out of the proceeds of the estate.

Hewlett & Dennis and Alfred S. Barnard, all of Atlanta, Ga., for intervener.

Little, Powell, Smith & Goldstein, of Atlanta, Ga., for receivers.

### Exceptions to Master's Report.

SIBLEY, District Judge. With the master's findings of the facts I am content, and adopt them. With the substance of his conclusions of law, except one, I agree.

[1, 2] While the deposit of stocks or money with a broker by a customer ordinarily carries a right in the broker to use them in forwarding the customer's business, this right does not extend to the use of them by the broker for his own independent purposes. In re Innis, 187 Fed. 720. Neither does the right prevail against an express agreement that they are to be held and not used. In re Toole, 274 Fed. 337; Thomas v. Taggart, 209 U. S. 385, 28 Sup. Ct. 519, 52 L. Ed. 845. The check

---

⬤⟳For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

deposited with the broker here was accompanied by the express written stipulation:

"Which you will hold for my account against any purchases of stock on my order, same to be held by you until the account is closed."

No doubt it was not intended that the physical check should be held, but that the money it called for should be, so that Imbrie & Co. were justified in collecting it. But the deposit was in essence a security for the final settlement; the ownership of the money, in equity at least, remaining with the depositor. Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981. Depositing the money in the general account of the broker did not alter its character as between Imbrie & Co. and Lynch. Central National Bank v. Conn. Mutual Insurance Co., 104 U. S. 54, 26 L. Ed. 693. Transactions in stocks of the sort contemplated did occur. One thousand shares of Coca-Cola stock were sold for Lynch on February 1, 1921, and bought in February 4, 1921, at a profit of $2,007. No further transactions occurred, and this profit was to Lynch's credit at the time of the failure in March, 1921. Only during the period from February 1st to February 4th was there anything for this deposit to secure, and during this period nothing was in fact done with it. Prior thereto, on January 27th, $9,500 of it was used by Imbrie's Atlanta office, under express instructions to do so from the New York office, in taking up the latter's draft, with certain bonds attached. After February 4th, similar transactions occurred, the effect of which was to leave in the hands of the Atlanta office certain stocks, which came to the receiver and were sold by him for $5,994.

None of these transactions affecting the $10,000 on deposit are shown by testimony or circumstances to have had any connection with Lynch's operations, and must be construed only as an effort on the part of Imbrie & Co. unauthorizedly to use this money, while protecting Lynch with the securities attached to the drafts which were taken up with it. Had Lynch known of them, he might have ratified or repudiated. Had he ratified before the receivership, he would, of course, have acquired a legal ownership in the bonds or stocks; their substitution for the money being then made by consent of both parties on sufficient consideration. In that case the words of the Supreme Court in Thomas v. Taggart, 209 U. S. at page 389, 28 Sup. Ct. at page 520, 52 L. Ed. 845, would have applied:

"They [the stocks] were not the property of Berry & Company [the bankrupt], but were held as collateral to her [plaintiff's] account, upon which she is not indebted to the broker. The certificates were returned to the trustees, who had no better right to them than the bankrupt. * * * If the property has been sold, the proceeds of sale takes the place of the property."

[3] But it is said there had been no ratification by Lynch at the time of the receivership, and that he cannot afterwards ratify. His first knowledge of the transactions seems to have come with this investigation, in which he has assiduously sought to follow them out, with the purpose of tracing his property. This is not a bankruptcy, but a receivership. It is difficult to see how a right of ratification can be cut off before it becomes known. But, independently of Lynch's acquiring

legal ownership by ratification, the doctrine of tracing a misapplied fund in equity as a trust would apply. While the deposit of this money was not a technical trust perhaps, it was in a literal sense intrusted with the entire title and control placed in Imbrie & Company, in confidence that it would be used only for a specific purpose.

The relation of customer and broker is as confidential as that of insurance company and its agent, dealt with in Central National Bank v. Conn. Mutual Insurance Co., supra. The misappropriation of money would entitle Lynch to follow it as a trust ex maleficio, at least, and equity would entitle him by this means to secure any benefit that the misappropriator obtained by it. It is true that it is not shown that Imbrie & Co. used this money or its proceeds to buy the stocks from third persons, but may have owned them all along; but it must be remembered that the New York and Atlanta offices were maintained separately, and dealt with one another as separate organizations, and Lynch's money was also treated as a special fund in the Atlanta office. This special fund, while still identifiable as a part of the general fund in Atlanta, was withdrawn by draft, and bonds and stocks put in its place, and these transactions were expressly handled as having reference to Lynch's $10,000.

There is no good reason, since the rights of no bona fide purchaser or lienor intervene, why this appropriation of the stocks now consented to by Lynch should not be recognized in equity. If I, as an agent, receive money which I ought to keep separate, but first mingle it with my own, then put it in bills into my left pocket, separate from my own money in my right, and then change the bills into silver dollars, which I put in their place, and lastly, for convenience in some transaction, take those dollars and substitute for them francs of equal worth, as I suppose, why, at any period of the exchanges, may not my principal, waiving the right to have the original money, claim what is in the left pocket as his, against me and my creditors?

[4] This, in substance, is what has happened here. Lynch has no superior right in the general fund to the $500 in excess of the $9,500 used to take up the draft, for the $500 are wholly unidentified in the fund now in court. He also suffers the loss of the difference between the $9,500 used and the value of the stock realized on the sale by the receiver; but he ought to have the proceeds of that sale, as being, at least equitably, his. The doctrine of tracing funds was considered applicable to a broker's similar dealings, though failing to be proven, in Schuyler v. Littlefield, 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806.

[5] This court, though exercising ancillary jurisdiction, may so decree. It is its duty to settle title and establish liens on property and funds in its hands, without remitting them and the litigants to the main jurisdiction. If the effort here were to assert a mere priority in payment out of the general assets, it would be otherwise. Here the effort originally was to assert title to $10,000 actually in this receiver's hands, and as it finally develops to assert title or an equitable interest in certain specific shares of stock coming into the receiver's hands. This court should adjudicate such claims.

[6] The first exception to the master's report should, however, be

282 F.—42

sustained. As just stated, the pleadings by Lynch assert title to $10,-000 in money in the hands of the receiver. He has failed to prove such a case. In order to assert his rights in the substituted stock, his bill must be so amended as to allege that case. Ten days are allowed to make such amendment, after which time a proper decree may be presented.

The costs on this intervention, including the fees of the master and stenographer, will be equally borne by the intervener and the receiver.