CHARLES H. FURBER *vs.* CHESTER L. DANE & others.

SAMUEL B. RAYMOND & another *vs.* SAME.

JULIAN DE CORDOVA *vs.* SAME.

SAME *vs.* SAME.

CHARLES F. FESSENDEN *vs.* SAME.

Suffolk.   March 15, 16, 1909. — July 19, 1909.*

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & SHELDON, JJ.

*Bills and Notes.* *Evidence,* Admissions and confessions. *Practice, Civil,* Agreed statement of facts. *Agency. Broker. Pledge. Equity Jurisdiction,* Following assets, Marshalling, Laches. *Bank. Words,* " Duly."

If the holder of a check does not present it for payment to the bank on which it is drawn before the close of banking hours on the day after that on which he received it, when, if it had been thus presented, it would have been paid, and presents it on the next day, when the drawer of the check has failed, and the bank refuses to pay it, he cannot hold the bank for the amount which he lost through his failure to present the check seasonably.

In a suit in equity by a creditor of an insolvent firm of brokers, who also was an employee of the firm, against the assignee of the firm for the benefit of the creditors and a bank in which the insolvent firm deposited a check received by them as the price of certain shares of stock of the plaintiff, which had been entrusted to them by the plaintiff for sale, where it appears that the plaintiff received a check of the insolvent firm for the price of his shares after banking hours on a certain day and that if he had presented this check for payment on the following day it would have been paid, but that he presented it only on the day after that, when the assignment had been made and the bank had applied the balance of the firm's deposit toward the payment of a loan due to it from the firm, so that the plaintiff cannot have a trust enforced upon the deposit to which he has traced the proceeds of his property, even if he otherwise might do so, because his loss is due to his failure to present the check seasonably, he is not aided by a statement in an agreed statement of facts that the check " was duly presented for payment," if in connection with these words the dates both of the receipt of the check and of its presentment for payment are stated carefully, and the whole of the firm's account with the bank is shown in detail, because, although the words if they stood alone would mean that the presentment was made not only in due manner but also in due season, yet in the connection in which they were used they manifestly were intended to state only

* The opinion in this case was withdrawn on an application for a rehearing. This was denied on September 8, 1909, when the opinion was returned to the Reporter.

that the presentment was made in a proper manner, and so cannot bind the defendants to an admission that the presentment was made in due season.

A person depositing with a stockbroker as a margin a certificate of shares of stock, indorsed in blank, is bound by the established customs of trade in the dealings which he employed the broker to carry on for him.

The provisions of R. L. c. 208, § 71, forbidding the holder of collateral security deposited with him for the payment of a debt to him from disposing of it by sale, pledge or otherwise before maturity of the debt secured by it, do not apply to a deposit with a stockbroker of a certificate of shares of stock, indorsed in blank, as additional margin called for by the broker in support of a purchase of other stocks which he is carrying on margin for the depositor of the certificate.

Whether or not stocks bought on a margin are to be treated as the property of the broker rather than that of the customer, at any rate the broker, when he acts in good faith, has greater rights both as to selling and as to pledging such stocks than without special contract would belong to an ordinary pledgee.

One for whom a firm of stockbrokers in Boston were carrying certain stocks on a margin, when called on by the brokers for additional margin, deposited with them as such additional margin a certificate for one hundred shares of a certain stock indorsed in blank. The brokers on receiving the certificate of shares gave to the depositor thereof a receipt in which was the following statement: "It is understood and agreed that all securities carried in this account or deposited to secure the same may be carried in our general loans and may be sold or bought at public or private sale without notice, when such sale or purchase is deemed necessary by us for our protection." It was shown that the custom of brokers in Boston was to treat stocks deposited as margin exactly like stocks bought upon margin. The firm of brokers pledged this certificate of shares, with other securities, to a bank as security for a note of the firm. There was nothing to show that in doing this they were acting dishonestly or in bad faith. Later the firm of brokers failed and made an assignment for the benefit of creditors, while the certificate of shares still was pledged to the bank. At the time of the failure the depositor of the certificate was a creditor and not a debtor of the firm and they had no right to retain his property as margin or security. Immediately upon the failure, he notified the bank of his interest in the certificate for one hundred shares of stock pledged to it, and requested it, before resorting to these shares, to sell and apply upon its note the other collateral security which it held from the firm of brokers. The bank sold most of the other securities for more than enough to pay the note of the brokers, paid a small surplus of money to the assignee and held the certificate for one hundred shares until the title to it should be determined. It was claimed both by its depositor and by the assignee. In a suit in equity to determine the rights of the parties, it was *held*, that it could not be said that the pledge of the certificate of shares by the firm of brokers was unlawful, but that, subject to the pledge, the depositor of the certificate could follow it, and, he having done so with due diligence and its identity having been preserved, neither the firm of brokers nor the assignee had the right to say that the other collateral held by the bank should not first be applied to the payment of the firm's note; therefore, that, the debts for which the certificate was pledged having been paid, it should be returned to its depositor.

In this Commonwealth the right of a bank, under ordinary circumstances, to apply the deposit of an insolvent debtor toward the payment of his indebtedness to the bank, is not in the nature of a lien but is rather in the nature of a set-off or application of payments, and for this reason the equitable owner of a certificate

of shares of stock, which was pledged to the bank by a broker who afterwards became insolvent and made an assignment for the benefit of creditors, leaving a balance deposited in the bank, cannot maintain a suit in equity to have the assets of the insolvent marshalled so as to apply the deposit to the payment of the debt of the insolvent to the bank to the exoneration of the plaintiff's stock; and, where in such a suit in equity it appeared that the plaintiff's stock was worth considerably more than the debt due to the bank from the insolvent, and that the deposit of the insolvent was nearly-sufficient to pay that amount, it was ordered that the bank should in the first instance apply the shares of stock to the payment of the insolvent's indebtedness to it, with interest and costs, and that on payment by the plaintiff of such indebtedness, with interest and costs, and subject to the lawful claims, if any, of other persons, the plaintiff was entitled to receive his shares of stock, and, after such payments had been made in full, the bank was ordered to pay the deposit of the insolvent to his assignee.

In suits in equity by a customer of a stockbroker, in which the plaintiff sought to follow the proceeds of certain shares of stock belonging to him, which, he alleged, had been pledged wrongfully by the broker, it appeared that the plaintiff had been buying and selling stocks on a margin through the broker, that, being about to sail for a foreign country, he went to the broker's office and told a person in the broker's employ that he was going abroad, and that he wished to leave with the broker some securities to protect himself if the market should go lower, but that he did not wish them taken out of his name or used unless it was necessary, as his account already had "plenty of margin," that he then handed to the employee of the broker certificates for certain shares of stocks, with unrestricted powers of attorney to transfer them all, that the employee of the broker gave the plaintiff a receipt in the name of the broker, which simply acknowledged that the stocks had been received, that two days later the broker pledged all of these stocks, and afterwards redeemed and repledged them, and thereafter became insolvent and made an assignment for the benefit of creditors, when the plaintiff's stocks were pledged to two banks, that the two banks sold the stocks with other securities held by them as collateral and applied the proceeds toward the payment of notes of the insolvent broker which they were pledged to secure, that before such sale and application the plaintiff gave no notice to either of the banks of his claim to the stocks, and, he being still absent in the foreign country, his son and attorney, without full knowledge of the facts and without instructions from the plaintiff brought an action in the name of the plaintiff against the broker directly, in which he attached funds in the hands of certain persons as the broker's alleged trustees. In the present suits the customer sought to hold the banks liable for the amount of the proceeds of his stocks which they had sold as collateral. *Held,* that, although as against the plaintiff the broker had no right to pledge the stocks in the way he did and was liable to the plaintiff for their value, yet as concerned third persons the broker had a right to pledge the stocks in the ordinary course of dealing, and such third persons without knowledge of the plaintiff's special instructions were not bound by the limitation which he had sought to impose, that, while the bringing of the action against the broker by the plaintiff's son in his behalf without full knowledge of the facts was not necessarily a waiver of the plaintiff's right, so far as he had such a right, to follow the securities themselves while they still could be traced, the plaintiff had lost his right to follow the proceeds of the stocks by allowing them to be sold rightfully by the banks to innocent purchasers for value, so that the plaintiff's bills must be dismissed, and he must be content to rank as a general creditor of the insolvent broker.

FIVE BILLS IN EQUITY as described in the opinion.

In the Superior Court the cases came on to be heard together before *Richardson*, J., who reported them for determination by this court as follows:

" The above entitled five suits came on for hearing before me for final decrees, and by consent of all the parties were heard together.   An agreed statement of facts was filed, and certain oral testimony and documentary evidence were introduced.   All parties requesting it, I hereby reserve and report the evidence, the agreed facts hereto appended and all questions of law therein for the consideration of the full court, such decrees to be entered in the several suits as equity and justice may require. It is agreed by all parties that any needed amendments of the pleadings may be made or may be considered as made in any and all of said suits."

*H. R. Bailey*, (*H. F. Atwood* with him,) for the plaintiff Furber.

*H. R. Bailey*, for the plaintiffs Raymond and Howe.

*F. M. Forbush*, (*H. Bennett & D. De Cordova* with him,) for the plaintiff Julian De Cordova.

*H. P. Mason*, for the plaintiff Fessenden.

*R. G. Dodge*, (*F. D. Webster* with him,) for the assignee.

*W. A. Sargent*, for the American Trust Company, submitted a brief.

SHELDON, J.   Dane, Smith and Company, stockbrokers, hereinafter called the firm, having become insolvent, made an assignment to the defendant Dodge, and he is now engaged in turning their assets into money for the benefit of their creditors who have assented to the assignment.   The several plaintiffs in these suits claim on equitable grounds that they are entitled to certain of those assets by reason of the character of their dealings with the firm.   The settlement of the questions involved makes it necessary to consider the rights of each plaintiff against Dodge, as the representative of the general creditors of the firm.

1. The plaintiff Furber was an employee of the firm.   On January 10, 1908, he gave the firm an order to sell for him twenty shares of a copper stock, and they sold fifteen of these shares for $757.50.   On January 13, he gave them a certificate

for the twenty shares properly indorsed. They transferred and delivered the fifteen shares to the purchaser thereof, received a check for the agreed price, and deposited this check, being the identical proceeds of the fifteen shares, in their general account with the American Trust Company which collected it. On the same day, January 13, but after banking hours, Furber received from the firm a check on the Merchants National Bank for $755.63, being the amount of the price less the firm's commission. Furber duly presented this check for payment on the morning of January 15, but it was not paid, the firm's assignment for the benefit of its creditors having been made in the afternoon of January 14, and the bank at the close of that day having applied the balance of the firm's deposit with it toward the payment of a loan due to it from the firm. The check since the assignment has had no value, and Furber always has been and is now ready and willing to surrender it to the firm or to Dodge their assignee. The firm's balance in the American Trust Company, at no time after the deposit of the check for $757.50, fell below that amount; and at the time of the failure that balance was $4,630.30.

Upon these facts, Furber contends that this balance of more than $4,000 is affected with a trust in his favor to the extent of the $755.63 due to him. He contends that when the proceeds of his stock were received by the firm, he became entitled thereto, and that since he has been able to trace these proceeds into the account and into the balance remaining on deposit at the time of the firm's failure, he has shown a trust attaching in his favor to that balance. *Cole* v. *Bates*, 186 Mass. 584. *National Bank* v. *Insurance Co.* 104 U. S. 54, 68. *In re Hallett's Estate*, 13 Ch. D. 696. It would be difficult to deny this contention if it appeared that the firm stood in a fiduciary relation to him as to the proceeds of his stock, and that none of the other parties had equities superior to and countervailing his. But we are of opinion that it is not necessary to consider these very interesting questions; for there is one circumstance which is fatal to his claim.

The check which he received from the firm on January 13 was not presented by him for payment until January 15. It would have been paid if it had been presented during banking

hours on January 14.   By this delay he made the check his own and can have no greater rights than those of an ordinary creditor.   *Taylor* v. *Wilson*, 11 Met. 44, 51.   *Gordon* v. *Levine*, 194 Mass. 418, 421.   See *Swett* v. *Southworth*, 125 Mass. 417, 421. Dan. Neg. Instr. (5th ed.) §§ 1276, 1623; also cases cited in 7 Cyc. 978.

But he contends that this defense is not open here, for the reason that it is stated in the agreed facts that this check " was duly presented " for payment.   If these words stood alone, they would show that the presentment was made not only in due manner, but in due season.   *Commonwealth* v. *Chase*, 127 Mass. 7, 13.   But in connection with these words the dates both of the receipt of the check and of its presentment for payment are carefully stated, and the whole of the firm's account with the Merchants Bank on January 14 is shown in detail. We think it manifest that the words " duly presented " were intended to indicate only that the presentment was made in proper manner, with proper indorsement upon the check and when the bank was open for business, and not to bind the parties to an agreement that the presentment was in due season. Many of the facts agreed with reference to this check otherwise could have no bearing upon any question in the case.   The meaning of the word " duly " was restricted in a like manner in *Boston* v. *Mount Washington*, 139 Mass. 15, 16; *Lunenberg* v. *Shirley*, 132 Mass. 498, 501.   And it must be remembered that this defense was expressly set up in the answer of Dodge.

It follows that Furber cannot maintain his bill.

2. In the second case, Raymond and Howe seek to recover one hundred shares of the United Shoe Machinery Corporation now in the hands of the Boston Penny Savings Bank, and two hundred other shares of the same stock now in the hands of the American Trust Company.   In August, 1907, the insolvent firm had bought, and was carrying on a margin certain shares of stock for Raymond, and held other shares of stock as collateral on a margin therefor.   On August 15, 1907, they called on him for additional margin, and he borrowed from Howe the one hundred shares first in question, Howe indorsing the certificate in blank, and deposited them with the firm as additional margin or collateral security.   The firm then pledged this certificate to

the Merchants National Bank as security for a loan made by that bank to the firm. Later the firm withdrew this certificate from the Merchants Bank, and on January 6, 1908, pledged it with other securities, some of which the firm had received from De Cordova, whose cases are hereafter to be considered, to the Boston Penny Savings Bank, as security for a note of the firm. At the time of the failure of the firm, the savings bank still held this note and these securities. These plaintiffs upon that failure notified the savings bank that they were equitably interested in the one hundred shares of Shoe Machinery stock, and requested it before resorting to these shares to sell and apply upon its note the other collateral security which it held. ' The savings bank sold most of its other securities for more than enough to pay its note, paid a small surplus of money to the defendant Dodge, and still has these one hundred shares. This stock is now claimed both by these plaintiffs and by Dodge.

In the meantime, on October 21, 1907, upon a call of the firm for yet more margin, Raymond borrowed from Howe and deposited with the firm two hundred more shares of the Shoe Machinery stock, also represented by certificates standing in the name of Howe and indorsed by him in blank. The firm pledged these shares and others with the American Trust Company as security for a note. Immediately after the firm's failure, Raymond and Howe gave to the trust company a notice and request substantially like that given to the savings bank as aforesaid. The trust company sold its other collateral, and applied the proceeds in part payment of its note. It still holds the two hundred shares of Shoe Machinery stock and the balance of the firm's deposit account, amounting, as before stated, to more than $4,600. The Shoe Machinery stock is worth considerably more than the amount remaining due to the trust company. The balance of the deposit account is nearly sufficient to pay that amount.

Raymond and Howe contend that they are entitled to have the securities held by the trust company marshalled, the amount of the balance of the deposit account applied to the payment of what remains due to the trust company, and the two hundred shares of stock exonerated to that extent. The defendant Dodge denies that these plaintiffs are entitled to that relief, and by a

cross-bill seeks to compel the bank to pay the amount of the deposit to him. And finally, Dé Cordova makes a claim, which will be considered hereafter, that he is himself entitled to enforce a trust in his own favor upon these two hundred shares and also upon the one hundred shares first mentioned of the Shoe Machinery stock.

It is of some importance that Raymond is, and at the date of the failure was, in any event a creditor and not a debtor of the firm. They have as against him no right to retain his property which was held merely as collateral security; of course they can have no such right against Howe, the real owner of that property. But if these stocks were delivered by Raymond to the firm wholly as margin upon the stocks which they were carrying for him, with the full right to use them as margin and not merely as collateral security for any indebtedness of Raymond that either then existed or afterwards might come into existence, a different question would be presented. It is necessary to see what the real contract between the firm and Raymond was. The agreed facts state that on August 15, 1907, the firm requested Raymond " to pay them a further sum of money as margin or else to deposit with them as margin additional securities," and that thereupon he " delivered " to them the second lot of two hundred shares. This would indicate that in each case the stock was given purely as margin, to be dealt with as such, and not merely as collateral security for any indebtedness that might arise out of the transaction. Moreover, in each of the statements rendered by the firm to Raymond after their receipt of these shares, was contained the statement : " It is understood and agreed that all securities carried in this account or deposited to secure the same may be carried in our general loans and may be sold or bought at public or private sale without notice, when such sale or purchase is deemed necessary by us for our protection." No distinction is made here between the stocks carried by the firm for Raymond and those deposited by him as margin; the firm is to have the same liberty of action as to each. And upon the evidence at the hearing it must be found that the custom of brokers in Boston is to treat stocks deposited as margin exactly like stocks bought upon margin. Whether or not stocks bought on margin are to be treated as

the property rather of the broker than of the customer (*Wood* v. *Hayes*, 15 Gray, 375; *Chase* v. *Boston*, 180 Mass. 458; *Richmond* v. *Shaw*, 209 U. S. 365; *Thomas* v. *Taggart*, 209 U. S. 385), there is no doubt that at any rate the broker has greater rights both as to selling and as to pledging such stocks, when he acts in good faith, than would without special contract belong to an ordinary pledgee. *Forget* v. *Baxter*, [1900] A. C. 467. *Bentinck* v. *London Joint Stock Bank*, [1893] 2 Ch. 120, 140. *Mocatta* v. *Bell*, 27 L. J. Ch. 237, 240. Raymond was bound by the established customs of trade in the dealings which he employed the firm to carry on for him. *Pollock* v. *Stables*, 12 Q. B. 765. *Sutton* v. *Tatham*, 10 Ad. & El. 27, 30. *Mitchell* v. *Newhall*, 15 M. & W. 308. The provisions of R. L. c. 208, § 71, forbidding the holder of collateral security deposited with him for the payment of a debt due to him from disposing of it by sale, pledge or otherwise before maturity of the debt secured by it, do not apply to a case like this. This stock was deposited, not merely as collateral security, but as a margin, and authority from its depositor is to be presumed in such a case. Nor can it be said that at the time of either of the pledges made by the firm the state of its account with Raymond is shown to be such as to lead to the conclusion that they were acting dishonestly or in bad faith.

Accordingly we cannot say that the pledges made by the firm of these shares were unlawful. But it does not follow that after payment of the debts for which they were pledged, and while they can still be followed *in specie*, they should go to the firm or to the firm's assignee. After all the charges properly to be made against them have been satisfied, the firm's special property in them no longer exists, and they should be returned to the general owner, if their identity has been preserved. Neither the firm nor Dodge their assignee had the right to say that the other collateral security held by the savings bank should not first be applied to the payment of the firm's note. It follows, subject to the claims of the other parties which have not yet been considered, that the one hundred shares in the hands of the savings bank should be delivered to Raymond and Howe.

As to the two hundred shares in the possession of the trust company, it must be determined whether that company has any

lien or right of detention upon the balance of the firm's deposit in its hands, and if so, whether this is a security which Raymond and Howe are entitled to have applied for their exoneration towards the payment of the trust company's note.

There is no doubt that under ordinary circumstances a bank has the right to apply the deposit of an insolvent debtor toward the payment of its claims against him. *Wiley* v. *Bunker Hill National Bank*, 183 Mass. 495, 497. *Clark* v. *Northampton National Bank*, 160 Mass. 26. *Wood* v. *Boylston National Bank*, 129 Mass. 358, 359, 360. *Demmon* v. *Boylston Bank*, 5 Cush. 194. This right of detention, or banker's lien, as it is sometimes called, attaches upon the securities and money of the customer deposited in the usual course of business for advances which are supposed to have been made upon their credit. *National Bank* v. *Insurance Co.* 104 U. S. 54, 71. But the right to detain for the general balance of account may be controlled by any special agreement which shows that it was not intended by the parties, nor does it exist where the circumstances or the particular modes of dealing are inconsistent with its existence. *Neponset Bank* v. *Leland*, 5 Met. 259. *Reynes* v. *Dumont*, 130 U. S. 354, 391. Securities pledged to the bank to secure a specified demand cannot be held for other demands though against the same debtor. *Hathaway* v. *Fall River National Bank*, 131 Mass. 14. *Brown* v. *New Bedford Institution for Savings*, 137 Mass. 262. Accordingly the right of a bank to apply the deposit of its debtor to the payment of his matured indebtedness has been denied if that indebtedness is fully protected by other collateral security. *McKean* v. *German American Savings Bank*, 118 Cal. 334, 340. *Farmers' National Bank* v. *McFerran*, 11 Ky. Law Rep. 183. Bolles, Modern Law of Banking, 749. Zane, Banks & Banking, 230, 231. And see the cases there cited. In our opinion, this is the proper rule.

But even if the bank could itself apply the amount of this deposit to the payment of its note, we feel bound to say that these plaintiffs have not the right to require it to avail itself of that privilege. It is settled in this Commonwealth, although a different rule has been adopted in some other States, that this right of a banker is not a lien or a right in the nature of a lien.

*National Mahaiwe Bank* v. *Peck*, 127 Mass. 298, 301. Gray, ·C. J., said in that case : " The bank, being the absolute owner ·of the money deposited, and being a mere debtor to the deposi- 'tor for his balance of account, holds no property in which the depositor has any title or right of which a surety on an inde- pendent debt from him to the bank can avail himself by way of subrogation. . . . The right of the bank to apply the bal- ance of account to the satisfaction of such a debt is rather in the nature of a set-off, or of an application of payments, neither of which, in the absence of express agreement or appropriation, will be required by the law to be so made as to benefit the surety." And for the same reason these plaintiffs are not en- titled to have the assets marshalled, and the deposit applied to the exoneration of their stock. See *Ticonic Bank* v. *Johnson*, 21 Maine, 426 ; *Second National Bank* v. *Hill*, 76 Ind. 223 ; *Voss* v. *German American Bank*, 83 Ill. 599 ; *Corn Exchange National Bank* v. *Locher*, 151 Fed. Rep. 764 ; *Webb* v. *Smith*, 30 Ch. D. 192. The innkeeper's lien considered in *Angus* v. *McLachlan*, 23 Ch. D. 330, is of a different character.

Accordingly we are of opinion that these plaintiffs cannot have the full relief which they seek as to the two hundred shares of stock. But for the reasons already stated as to the one hundred shares in the possession of the savings bank, they will be entitled, upon payment of the balance due upon the note held by the trust company, with interest and costs, and subject to the lawful claims, if any, of the other parties, to receive the two hundred shares. And one single decree is to be entered upon the bill of these plaintiffs and the cross-bill of the defendant Dodge. For the reasons already stated, we are of opinion that this decree, besides providing for the rights of Raymond and Howe as afore- said, should order the American Trust Company to apply in the first instance the two hundred shares of stock to the payment of its note, and after the full payment of that note with interest and costs to pay to the defendant Dodge as assignee of the insol- vent firm the amount of that firm's deposit now in its hands.

3. We proceed to consider the claims made by the plaintiff De Cordova.

Before September 17, 1907, he had been buying and selling stocks on margin through one Hines, who, not being a member

of the Boston Stock Exchange, had employed the insolvent firm
to make the purchases and sales. These dealings, which in-
cluded the transactions of other customers of Hines, had been
carried on the firm's books under the name of Frank Arthur.
But on that day Hines separated the Frank Arthur account and
caused the dealings of this plaintiff with him to be carried on
the firm's books under the right name of Julian de Cordova.
The plaintiff did not know until that day that Hines was exe-
cuting his orders through the firm. But on September 28 he
went to the firm's office and there saw one Richardson who was
in the firm's employ. The evidence as to what was said in that
interview is somewhat conflicting; but it fairly appears, we
think, that De Cordova told Richardson in substance that he,
De Cordova, was going abroad, as was the case, and wished to
leave some securities with the firm to protect himself if the
market should go lower, but that he did not wish them taken
out of his name or used unless it was necessary, as his account
had already "plenty of margin." He then handed to Richard-
son certificates for five shares of stock in one bank, fourteen
shares in another bank, and twelve shares of telephone stock,
with powers of attorney to transfer them all. But he left these
stocks with the firm simply as an additional margin upon his
account, and he understood that the firm was authorized to
pledge them, though he requested that this should not be done
unless necessary. Richardson gave to him a receipt in the name
of the firm, which simply acknowledged receipt of the stocks.
On September 30, 1907, the firm pledged all these stocks to a
bank to secure a loan ; and they were afterwards redeemed and
repledged until finally the five shares of bank stock were pledged
with the Raymond one hundred shares already mentioned and
other securities to the Boston Penny Savings Bank to secure the
note due to that bank; and the rest of De Cordova's stocks
were pledged with Raymond's two hundred shares and other
securities to the American Trust Company to secure the note
due to that company. Each of these two corporations after-
wards sold this plaintiff's stocks together with other securities
held by it, and applied the proceeds upon its note as already
stated. This plaintiff seeks in his first bill to recover the pro-
ceeds of his stocks so pledged to and sold by the American

Trust Company, and in his second bill to recover the proceeds of those pledged to and sold by the savings bank.

As against this plaintiff, the firm ought not to have pledged his stocks, and are now indebted to him in a large sum of money. But as concerns third parties and the other creditors of the firm it follows from what has been said that the firm had the right to pledge these stocks in the ordinary course of dealing. He had entrusted them to the firm as margin, which would give a full right to pledge or use them in the usual course of business, accounting to him for them. He had put into the hands of the firm the means of giving full title to all the stocks to any one who might take them either in pledge or by purchase. Third parties with no notice of the special instructions given by him to the firm would not be bound by the limitation which he had sought to impose. The respective pledgees accordingly took a valid title to these stocks, and had a right to sell them and apply the proceeds to the payment of their notes. Doubtless, if the sales had not been made, this plaintiff could redeem his stocks by paying the debts for which they were pledged, or could have taken them without payment if those debts had been otherwise paid, either by the firm or by the sale of other security, as we have already seen can be done by Raymond and Howe. But this right depends upon the ability to trace the specific property or its proceeds. *Lowe* v. *Jones*, 192 Mass. 94. *Little* v. *Chadwick*, 151 Mass. 109. *Portland & Harpswell Steamboat Co.* v. *Locke*, 73 Maine, 370. Raymond and Howe, by reason of their diligence in notifying the savings bank and the trust company of what they claimed to be their rights, are able to do that; but this plaintiff, instead of giving similar notices, adopted the course of suing the firm directly for their liability to him;[*] and this was inconsistent with the assertion of a right to follow the securities and to claim them specifically. *Raphael* v. *Reinstein*, 154 Mass. 178. We do not mean to intimate that the bringing of this suit in the plaintiff's behalf, in his absence from the country, by his son and attorney without full knowledge of the circumstances and without instructions from the plaintiff, was

---

[*] This refers to an action at law in the Superior Court brought for De Cordova, by his son in his absence, in which the Merchants National Bank and the American Trust Company were summoned as trustees.

necessarily a decisive waiver of his right, so far as he had the right, to follow the securities themselves, while they still could be traced, but simply that it was a circumstance which naturally tended to induce the savings bank and the trust company to include his stocks in the securities which they sold. Their action was rightful, even against him; and one of the results of that action is that he now can no longer trace his stocks, which have passed into the hands of innocent purchasers for value, who have a right to say that they took their titles with his consent; nor can he trace the proceeds of those sales, which have been lawfully applied to the payment of the notes that were secured by them, and have passed into the general funds of the trust company and the savings bank respectively. *Hauk* v. *Van Ingen,* 196 Ill. 20. *Commercial & Farmers Bank* v. *Davis,* 115 N. C. 226. *Illinois Trust & Savings Bank* v. *First National Bank,* 15 Fed. Rep. 858. *Philadelphia National Bank* v. *Dowd,* 38 Fed. Rep. 172. In *Sillcocks* v. *Gallaudet,* 66 Hun, 522, the plaintiff was allowed to have only those stocks or their proceeds which he could specifically trace.

Nor has this plaintiff any right to share the benefit which Raymond and Howe have gained by their superior diligence. They elected to take one course, and now derive an advantage therefrom. His agent elected to take another course; and although he now may not be bound by that election, it yet remains true that he did not seasonably decide to adopt the remedy which they adopted from the beginning. If his attachment of the funds in the hands of the firm's alleged trustees had turned out to be sufficient for his protection, as might have been the case, he would have had no motive for abandoning that remedy and seeking to avail himself of the means of redress resorted to by Raymond and Howe. The doctrine of *McBride* v. *Potter-Lovell Co.* 169 Mass. 7, is not applicable to the circumstances of this case. In our opinion, this plaintiff cannot maintain either of his bills, but must be content to rank as a general creditor of the insolvent firm.

4. The circumstances disclosed upon the bill brought by Fessenden do not differ in any material respect, so far as the questions of law are concerned, from those which already have been considered. It follows that his bill cannot be maintained.

Each of the bills except that brought by Raymond and Howe must be dismissed. On that bill, a decree must be entered in accordance with what has been said above.

*So ordered.*