## In re CODMAN et al.

(District Court, D. Massachusetts. August 29, 1922.)

No. 2328.

1. **Courts ⬅359—Contracts of bankrupt governed by local law.**
The validity and construction of contracts between a bankrupt broker and customers are to be determined by the local law.

2. **Brokers ⬅24(1)—Relations with margin customers not fiduciary.**
Under the· law of Massachusetts the relation between a broker and margin customers is not fiduciary, but one of debtor and creditor.

3. **Bankruptcy ⬅140(3)—Stocks not held by broker in trust for customer.**
Under the law of Massachusetts on bankruptcy of a broker holding stocks deposited by, or bought for, a customer, as collateral security for his account, "which stocks were mingled with others from which they were not distinguishable, the certificates being indorsed in blank and not having been transferred to the customer's name, the customer cannot recover from the trustee, as a trust fund, the net value of such stocks after payment of his indebtedness to bankrupt.

In Bankruptcy. In the matter of Alfred S. Codman and others, bankrupts. On review of order of referee. Affirmed.

The following is the opinion of the referee in bankruptcy on the petition of Clara F. Chapin, executrix:

I, James M. Olmstead, one of the referees of said court, in bankruptcy, do hereby certify that in the course of the proceedings in said cause before me the following question arose pertinent to the said proceedings:

Prior to May 16, 1918, when an involuntary petition was filed against the debtors, they were copartners engaged in business as stockbrokers in Boston. They owed various banks holding securities the sum of $712,500, and were indebted to more than 250 margin customers on open accounts scheduled as unsecured creditors in sums aggregating $610,000. Some time prior the petitioner's testator had a margin account with the debtors as his brokers, and his account was credited with a list of securities, some of which he had brought in and deposited with the debtors, and some of which he had ordered them to purchase.

The case was submitted on an agreed statement of facts, which is quite lengthy because it describes in detail the various proceedings had in the case, not only with the petitioner, but with many other creditors similarly situated. A portion of paragraph 4 of the agreed statement of facts is as follows: "That none of said securities brought in by said Chapin were in the possession of the bankrupts on the date of the filing of the petition in bankruptcy, and that the remainder of said securities credited on said margin account were securities which said Chapin had duly ordered the said bankrupts as his brokers to purchase; that none of the certificates representing the said securities ordered from the said bankrupts were in the name of the said Chapin; that all securities purchased by said bankrupts were so-called street certificates, being certificates standing in the names of other persons, indorsed in blank, and were in some instances transferred by the said bankrupts immediately into their own names; that no certificates were set apart by the bankrupts or in any way identified as the property of said Chapin, but were mingled by the said bankrupts in accordance with the custom of brokers with other like securities, some of which were the property of the bankrupts, and some of which had been purchased for, or deposited as collateral by, other customers, and that all said securities, whether purchased for or deposited by said Chapin, were thereafter to be security for loans and com-

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

missions due from said Chapin to the said bankrupts on account of the purchase and sale of securities for said Chapin by the said bankrupt in pursuance of their business as stockbrokers; that the amount of said loans and commissions due to the said bankrupts from said Chapin at the date of the bankruptcy, as appears from the books of the said bankrupt, was the sum of $10,684; that the relations between said Chapin and said bankrupts were those commonly existing between stockbrokers and their margin customers."

All of the securities brought in by said Chapin or purchased on his account were pledged by the debtors according to the usual custom of brokers, to secure loans, and were held by various banks. This was true of a large number of customers whose collateral was held by many banks, and upwards of 50 suits had been brought by the various customers in the form of bills in equity against the banks, seeking to follow their collateral and establish a lien or trust thereon. In order to bring these various claims and this multitude of suits before one tribunal, an arrangement was entered into as a part of the proceedings whereby all these creditors, including the petitioner, agreed to a plan by which the court of bankruptcy was decided upon as the tribunal to liquidate the claims of the banks, and to distribute the surplus realized from the sale of the collateral to the various claimants. The petitioner's securities, when sold, realized the sum of $16,195.35. Her indebtedness to the debtors at the time of the failure amounted to $10,684, leaving a balance claimed of $5,511.35, but this balance was subsequently reduced, and her claim proved and allowed in the sum of $5,248. Her share in this distribution amounted to $649.94. A dividend of 5 per cent. was subsequently declared in the estate, after some delay, on the revised proof of claim, amounting to $271.05, making a total of payments to the petitioner of $920.99. The petitioner's claim, by which he seeks to redeem his stocks or the value thereof, amounts to $4,590.36, which is the sum arrived at after deducting $920.99, being the sum of the distribution and dividends received, from the sum of $5,511.35.

The trustee contends that by the receipt of the distribution with the dividends totaling $920.99 the petitioner is estopped in any further proceedings for redemption or recovery; but the petitioner denies this contention on the ground that in her proof of claim and in the agreement assenting to the distribution of the collateral she was careful to reserve the right to take any other further proceedings, and that such exceptions did not amount to a waiver. In the case of Thomas v. Taggart, 209 U. S. 385, 392, 28 Sup. Ct. 519, 52 L. Ed. 845, the court held that by proving a claim and participating in the proceedings the creditor did not waive his right to insist on recovery by other remedies.

Waiving, therefore, the question of estoppel, after the above abstract of the lengthy agreement of facts, I proceed to consider the merits of this case and the law applicable thereto. The learned counsel for the petitioner contends that the law governing the parties is to be found on the federal side of the court, inasmuch as the proceeding is one in bankruptcy. I am of the opinion, however, that this case and the contractual relations are to be determined according to the law of this commonwealth, and cite in support thereof the case of Bryant v. Swofford Bros., 214 U. S. 279, 290, 29 Sup. Ct. 614, 618 (53 L. Ed. 997) in which the court says: "In bankruptcy the construction and validity of such a contract must be determined by the local laws of the state."

Counsel for the petitioner in his able brief contends that the relation of the broker to his margin customers is a fiduciary or trust relation. He insists that the early rule in Massachusetts has been modified by later decisions of the Massachusetts Supreme Court. An examination of these later cases in my opinion does not sustain his position. In Brown v. Corey, 191 Mass. 189, 191, 77 N. E. 838, 839, which was a margin case, the court distinctly says, "The ordinary relation between a broker and his client or customer which, though it involves a certain amount of trust and confidence in the broker on the part of the customer, is not a fiduciary relation, but a relation as debtor and creditor," and cites in support thereof Chase v. Boston, 180 Mass. 458, 62 N. E. 1059. Furber v. Dane, 203 Mass. 108, 89 N. E. 227, and 204 Mass. 412, 90 N. E. 859, 27 L. R. A. (N. S.) 808, may be said to be a leading case.

The outcome of both decisions (204 Mass. 419, 90 N. E. 861, 27 L. R. A. [N. S.] 808) was that "the plaintiff must be left to his rights as a general creditor." The facts were as follows: Furber got a check for the shares sold for him by the debtors on the 13th of January, 1908, but delayed presentation until the 15th. The assignment was the 14th; but had he presented the check that day it would have been paid. The court says: "By this delay he made the check his own, and can have no greater rights than those of an ordinary creditor," and could establish no trust against the deposit in the bank upon which the check was drawn. In the sequel to this case the court says, by the amendment to the agreed facts: "It must be determined, then, whether there was a relation of *trust*, between the firm and the plaintiff, or whether they stood towards each other merely in the relation of *debtor and creditor*." (Italics mine.) In the same case of Furber v. Dane, 204 Mass. at page 416, 90 N. E. 860, 27 L. R. A. (N. S.) 808, the court treats brokers the same as commission merchants or factors who mingle funds with their own, saying that the relation as to their customers is "merely that of debtor and creditor, and not a fiduciary relation." On page 417 of 204 Mass. (90 N. E. 860, 27 L. R. A. [N. S.] 808) the court says: "Under the rule adopted in this commonwealth it cannot be said that the character of the transaction between the plaintiff and the firm was such as to create any fiduciary relation between them, or to give to the plaintiff any other or greater rights than those of a general creditor. It is fairly to be inferred from the agreed facts and the evidence that the plaintiff assented to the course of dealing which was adopted and to the establishment thereby of the relation of debtor and creditor between the firm and himself, instead of requiring the specific proceeds of his stock to be paid to him as he might have done. The English cases to which we have been referred, in which it has been either stated or assumed that a trust relation exists between a stock broker and his customers, have not been followd in this commonwealth."

On page 115 of the same case in 203 Mass. (89 N. E. 229) a distinction between stock deposited "merely as collateral security" and as "purely margin" was made, and the law applied.

The next case in order, that of Fiske v. Doucette, 206 Mass. 275, 284, 285, 92 N. E. 455 was also a margin case, in which the bucket shop or gaming statute (R. L. c. 99, § 4) was involved. In this case it was held that "fictitious sales" or "clear wagering contracts" were forbidden under said statutes, and that settlements "through the Stock Exchange Clearing House" did not make the transactions real or less fictitious. While the courts seem to be groping in the dark for light on this complicated subject, even the legislators seem to have changed their position, as is evidenced by the Act of 1919 (c. 247), whereby the gaming statute (R. L. c. 99, § 4) was subsequently modified, so that transactions in accordance with the clearances and rules of the Stock Exchange were held proper fulfillments of stock transactions.

Crehan v. Megargel, 235 Mass. 279, 126 N. E. 477, was also a margin case, and the court held that "the legal title to the stocks carried on margin was in the brokers," according to the Massachusetts law as opposed to the New York rule as laid down in the leading case of Markham v. Jaudon, 41 N. Y. 235. In this case the brokers were held responsible because they did not have at all times in their possession or control the stocks they were carrying deliverable to the customers.

Greene v. Corey, 210 Mass. 536, 97 N. E. 70, was another margin case to the same effect.

Perhaps the latest Massachusetts margin case is that of Weisberg v. Hunt, 239 Mass. 190, 131 N. E. 471. The finding was for the defendant on the ground that it had complied with its contract as contained in the receipts given, and, as all transactions were in accordance with the clearances and rules of the Exchanges, there was no violation of the contract between plaintiff and defendants. The gaming statute (R. L. c. 99, § 4) was not involved, but the transactions seemed to have conformed to the law as modified by the later act of 1919 (chapter 247).

In the case of wagers the claimant under R. L. c. 99, § 4, is allowed to prove as a general creditor for the "amount of the payments made from time to

time as margins." Streeter v. Lowe, (C. C. A. 1st Cir.) 184 Fed. 263, 268, 106 C. C. A. 405, 25 Am. Bankr. Rep. 774, 778.

So much for a discussion of the Massachusetts decisions.

Under the doctrine of the federal decisions the leading case may be said to be Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, which was also a margin case. An examination of this decision would show that it determined that the relation, according to the New York case of Markham v. Jaudon, supra, was not that of debtor and creditor, and that hence the broker, being the pledgee according to the New York doctrine in returning stocks was not guilty of a preference.

Thomas v. Taggart, 209 U. S. 385, 388, 28 Sup. Ct. 519, 52 L. Ed. 845, was a margin case, but the receipt given shows that the shares were deposited as a special deposit "as collateral on account," and were not held as margin for shares to be purchased on a general margin account. The court held that the shares returned by the bank after its loan was paid belonged to the customer, just as the collateral of Raymond and Howe in the case of Furber v. Dane, 203 Mass. 108, 113–118, 89 N. E. 227, was restored to them, conforming somewhat to the scheme of distribution made in the instant case.

Gorman v. Littlefield, 229 U. S. 19, 25, 33 Sup. Ct. 690, 691, 57 L. Ed. 1047, involved the failure of Brown & Co. of New York. The shares in this case were fully paid for and sufficient shares were found in the "same tin box" to satisfy the customer's claim, but the court says: "The significant fact is shown that no other customer claimed any right in those shares of stock."

An interesting question arises as to how the court would marshal the rights if other claimants to the same stock had appeared. Perhaps its solution may be found in the later case of Duel v. Hollins, 241 U. S. 523, 36 Sup. Ct. 615, 60 L. Ed. 1143, infra, where the various claimants to the same stock were allowed to prorate their demands.

In Schuyler v. Littlefield, 232 U. S. 707, 713, 34 Sup. Ct. 466, 58 L. Ed. 806, there was an attempt in the same failure of Brown & Co. of New York to trace payments for stock as a trust, under the doctrine of Knatchbull v. Hallett, L. R. 13 Ch. Div. 696, where trust funds mingled with individual deposits were dissipated. The court held that, identification being in doubt. "the doubt must be resolved in favor of the trustee, who represents all the creditors of Brown & Co., some of whom appear to have suffered in the same way. Like them, the appellants must be remitted to the general fund."

Duel v. Hollins, 241 U. S. 523, 530, 36 Sup. Ct. 615, 617 (60 L. Ed. 1143), is the latest case in which the court awarded the stock claimed in "pro rata parts." But the dissenting opinion by Justice Pitney concurred in by Justice Hughes, significantly says: "The presumption of intent to restore fractional interests in this case must rest on the merest fiction; and such a fiction ought not to be indulged in in cases of this character, where it will inevitably result in creating a series of arbitrary preferences, contrary to the equity of the Bankruptcy Act."

It is somewhat difficult to reconcile the case of Hennequin v. Clews, 111 U. S. 676, 682, 683, 4 Sup. Ct. 576, 28 L. Ed. 565 which involved the pledge of collateral securities by Hennequin & Co. with their bankers Henry Clews & Co., of New York with the doctrine laid down in Richardson v. Shaw, supra. In the latter case the customer, contrary to the Massachusetts rule, was held to be the owner, and hence not responsible as a creditor in a preference suit. In the former case the bankers who had not returned the collateral were allowed to set up their discharge in bankruptcy as a defense to the customer's suit as a creditor to obtain the bonds. The court held that the relation was one of debtor and creditor, likened the relation of broker and customer to that of "commission merchants and factors," and ruled that no technical trust relationship existed in such case as in England. On page 683 of 111 U. S. (4 Sup. Ct. 580, 28 L. Ed. 565) Mr. Justice Bradley says: "It is evident that the English courts regard many transactions as frauds or breaches of trust under their statutes which we do not hold to be such under our bankrupt acts. Perhaps the liberal construction made in favor of the certificate of discharge in this country is due to the peculiar modes and habits of business prevailing amongst our people."

In the case of In re Swift (D. C.) 108 Fed. 212, 5 Am. Bankr. Rep. 232; 113 Fed. 202, 51 C. C. A. 159, 8 Am. Bankr. Rep. 20, the referee found that the relation of E. C. Hodges & Co., of Boston, to their customers was that of debtor and creditor relying largely on Hennequin v. Clews, 111 U. S. 676, 4 Sup. Ct. 576, 28 L. Ed. 575, supra, and Little v. Chadwick, 151 Mass. 109, 23 N. E. 1005, 7 L. R. A. 570, but the District Court and Circuit Court of Appeals, reversing him, found that a trust relationship existed.

In Little v. Chadwick, 151 Mass. 109, 110, 23 N. E. 1005, 7 L. R. A. 570, Mr. Justice Charles Allen says: "When trust money becomes so mixed up with the trustee's individual funds that it is impossible to trace and identify it as entering into some specific property the trust ceases. The court will go as far as it can in thus tracing and following trust money; but when, as a matter of fact, it cannot be traced, the equitable right of the cestui que trust to follow it fails. Under such circumstances, if the trustee has become bankrupt, the court cannot say that the trust money is to be found somewhere in the general estate of the trustee that still remains; he may have lost it with property of his own; and in such case the cestui que trust can only come in and share with the general creditors."

In the case of In re Swift (D. C.) 5 Am. Bankr. Rep. 232, 239, supra, the following rule was suggested: "If the customer, therefore, desires to protect himself and his collateral it woud seem that the ony safe course for him to pursue would be to establish a technical trust relationship, or to deposit his securities in the form of a special deposit." I cannot find that the customer in the instant case took this precaution. I accordingly entered an order dismissing said petition.

And the said question, together with the pleadings, and briefs of learned counsel, is certified to the judge for his opinion thereon.

E. Irving Smith, of Boston, Mass., for petitioner.

Horblit & Wasserman, of Boston, Mass., for trustee.

MACK, Circuit Judge. I have given careful consideration to the very able argument, supplemented by the essay in the Harvard Law Review,[1] on behalf of the petitioners, and if I had not been satisfied in advance that the reasoning adopted by the United States Supreme Court and the courts of the states other than Massachusetts were sound, I should assuredly have been convinced by the argument.

[1-3] But concededly it is the law of Massachusetts that governs the right of the parties, and I am equally well satisfied that the decisions cited on behalf of the petitioners have not effected a change in the principles so long established in Massachusetts.

The petition for review must be dismissed, and the order of the referee affirmed.