## In re CAWLEY.

District Court, D. Massachusetts. November 27, 1928.

No. 27336.

Friedman, Atherton, King & Turner, of Boston, Mass., for petitioners.

Atherton N. Hunt, of Boston, Mass., for trustees.

BREWSTER, District Judge. The referee's certificate in this case brings up for review an order denying a petition to reclaim certain securities now in the possession of the

trustee in bankruptcy. The following facts appear:

The bankrupt was a stockbroker, with whom the petitioners carried open or margin accounts. The petitioners delivered to the bankrupt 10 shares of common stock of Inspiration Copper Company, 10 shares of common stock of American Agricultural Chemical Company, 20 shares of common stock of Union Pacific Railroad Company, and 10 shares of preferred stock of Continental Motors Company.

These securities, together with securities of other customers, were pledged by the bankrupt with the Liberty Trust Company, to secure a loan made by that company. Before adjudication, the trust company had sold enough of this collateral to satisfy its loan, and it subsequently delivered to the trustee in bankruptcy the securities which remained in its hands as surplus after the liquidation. These securities included the shares of stock above mentioned. The certificates returned to the trustee, representing the shares in the American Agricultural Chemical Company, the Continental Motors Company, and Inspiration Copper Company, were the identical certificates delivered by the petitioners to the bankrupt. The certificate representing the stock of the Union Pacific Railroad Company was one issued in lieu of two certificates, of 10 shares each, delivered by the petitioners to the bankrupt.

The referee found that, on the books of the bankrupt, there was a debit balance against the petitioners, but refused to receive evidence offered to show that the bankrupt had never actually made purchases and sales, but that the transactions were what are commonly known as "bucketing" transactions.

The referee reached the conclusion that the petitioners were not entitled to reclaim the specific shares from the trustee, and ordered that the securities be marshaled and distributed among all the persons whose securities had been hypothecated with the Liberty Trust Company, those claimants whose securities were wrongfully repledged to be preferred over those whose securities were lawfully rehypothecated.

The correctness of this conclusion is assailed by the petitioners, who rely upon certain decisions in the federal and state courts, of which the leading are Richardson v. Shaw, 209 U. S. 365, 28 S. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; Thomas v. Taggart, 209 U. S. 385, 28 S. Ct. 519, 52 L. Ed. 845; In re McIntyre, Pippey's Appeal (C. C. A.) 181 F. 955; Johnson v. Bixby (C. C. A.) 252 F. 103, 1 A. L. R. 660; Furber v. Dane, 203 Mass. 108, 89 N. E. 227.

If this controversy involved cash proceeds, received by the trustee from the bankrupt's pledgee as surplus remaining after the loan had been liquidated, there could be no doubt concerning the duty of the referee to marshal and distribute these proceeds among those whose securities had been pledged according to their several equities. In re Gay & Sturgis (D. C.) 251 F. 420; In re Codman et al. (D. C.) 284 F. 273; In re Codman, Fletcher & Co. (C. C. A.) 287 F. 806; Sutcliffe v. Cawley, 240 Mass. 231, 132 N. E. 406; McBride v. Potter-Lovell Co., 169 Mass. 7, 47 N. E. 242, 61 Am. St. Rep. 265.

So far as I have been able to discover, this case presents, for the first time in this district, the question whether the same distribution may be made where the identical securities deposited by a stockbroker's marginal customer have survived the liquidation, while those of other customers pledged to secure the same loan have been sold and the proceeds applied to the satisfaction of the obligation.

It well may be argued that there is room for an important distinction between a case involving cash surplus remaining after the selling of all the securities and one where the securities survived in specie. In the former case, it would be impossible to identify in the cash surplus the proceeds of any particular security sold, while in the latter case the identification is complete. I find, however, that the courts have developed a doctrine which, if adopted in this case, will lead to results similar to those reached in Re Gay & Sturgis, supra, and in Re Codman, Fletcher & Co., supra.

It is well settled, both in the Massachusetts courts and in the federal courts, that, as between the customer and the trustee in bankruptcy of the broker, such surviving securities belong to the customer who left them with the broker to protect his margin. Furber v. Dane, supra; Thomas v. Taggart, supra; Richardson v. Shaw, supra; In re McIntyre & Co., Pippey's Appeal, supra, at 957 of 181 F.

This was apparently the opinion of Judge Morton in Re Gay & Sturgis, supra.

While it may be conceded on the authorities that the depositor of the surviving securities is to be regarded as the legal owner of them, rather than the trustee of the bankrupt stockbroker, the obvious trend of the later decisions is to impose upon such owner the duty of assuming his share of the burden of the loan. In re Ennis et al. (C. C. A.) 187 F. 720; In re J. C. Wilson & Co. (D. C.) 252 F. 631; In re Toole (C. C. A.) 274 F. 337; In re Archer, Harvey & Co. (D. C.) 289 F. 267; In re Walter J. Schmidt & Co. (D. C.) 298

F. 314; Duncan v. Johnston & Co. (C. C. A.) 3 F.(2d) 422; In re Green et al. (C. C. A.) 11 F.(2d) 676; In re Lauzier-Wolcott & Co. (C. C. A.) 20 F.(2d) 591; In re Kardos et al. (C. C. A.) 27 F.(2d) 690; Asylum of St. Vincent de Paul v. McGuire, 239 N. Y. 375, 146 N. E. 632, 38 A. L. R. 1214; Whitlock v. Seaboard National Bank, 29 Misc. Rep. 84, 60 N. Y. S. 611.

The right to contribute, thus invoked, is said not to be dependent on contract, or joint action, or original relationship between the parties. It is rather based on principles of fundamental justice and equity. Asylum of St. Vincent de Paul v. McGuire, supra; In re Toole, supra.

In In re Toole (C. C. A.) 274 F. at page 344, the court remarked: "We think that, when customers authorize their broker to pledge their securities for the payment of the broker's debts, each becomes to the extent of his pledge a surety for the payment of such indebtedness. As between themselves they become cosureties. All the collateral lawfully so pledged is subject to the same obligation and lien. The owners of the collateral, being in effect cosureties, must be entitled to contribution from each other for any loss sustained if the stock of one is sold to pay the debt for which the stock of the other was equally liable." The court, after noting that the adoption of a contrary theory would lead many times to unfair practice and work gross injustice, stated that "the courts in the United States and England have long acted upon the principle that between different creditors equality is equity. Equality, according to Bracton, constitutes equity itself. All debts are generally deemed by courts of equity to stand in pari jure and are to be paid proportionally." It hardly comports with the maxim that equality is equity to permit the property of one marginal customer to be sacrificed and that of another, in exactly the same position, to be preserved depending upon, as one writer has aptly put it, "the flip of a bank teller's coin." 37 Harvard Law Review 860, 877.

This doctrine of contribution is indispensable to any equitable adjustment of the respective rights of parties similarly situated with respect to the rehypothecation of customers' securities by their broker. And it ought to be applied, whether we adopt the Massachusetts theory of contractual relationship between broker and customer (Wood v. Hayes, 15 Gray [Mass.] 375; Covell v. Loud, 135 Mass. 41, 46 Am. Rep. 446; Weston v. Jordan, 168 Mass. 401, 47 N. E. 133; Chase v. City of Boston, 180 Mass. 458, 62 N. E. 1059; Rice v. Winslow, 180 Mass. 500, 62 N. E. 1057), or the federal theory that the relationship is that of pledgor and pledgee (Richardson v. Shaw, supra; Gorman v. Littlefield, 229 U. S. 19, 33 S. Ct. 690, 57 L. Ed. 1047; Duel v. Hollins, 241 U. S. 523, 36 S. Ct. 615, 60 L. Ed. 1143).

I am also prepared to accept the general doctrine of contribution as equally applicable whether the surplus, remaining after liquidation, consists of cash proceeds of securities sold or of securities returned unsold.

It is true that the cases relied upon by the claimants include those in which the claimants to specific surviving securities have succeeded in recovering them, or their traceable proceeds, without being called upon to make contribution to other claimants whose shares did not survive the pledge. A critical examination of them, however, does not satisfy me that these cases can here be regarded as decisive authority. In Thomas v. Taggart, supra, the court dealt only with the question of title to the shares as against the trustee in bankruptcy of the broker. No question was there raised involving any obligation to contribute. Matter of McIntyre, Appeal of Pippey, supra, has been so frequently explained and distinguished in recent decisions, in the Second Circuit and elsewhere, that its value as a precedent is negligible. See In re J. C. Wilson & Co., supra; In re Toole, supra; In re Archer, Harvey & Co., supra. And the courts of that circuit and the District Court of Maryland (In re Archer, Harvey & Co., supra), have refused to adopt the doctrine of Johnson v. Bixby, supra, decided in the Eighth Circuit.

In Furber v. Dane, supra, the Supreme Judicial Court of Massachusetts dealt with the rights of two plaintiffs, customers of a bankrupt stockbroker, with whom each carried marginal accounts. Before bankruptcy each had delivered to the broker securities to protect the margin on his respective account. The broker had lawfully rehypothecated these securities to secure a loan which he had obtained from his bank. After bankruptcy, the bank liquidated the collateral, selling De Cordova's securities, but retaining, as surplus, the securities of Raymond. The court held that Raymond was entitled to receive his securities from the bank, while De Cordova was relegated to the position of a general creditor. There seems to have been no consideration given to any right of contribution which De Cordova may have had, unless the court had it in mind when it observed that the shares should be delivered to Raymond, "subject to the claims of the other parties which have not yet been considered," and had regarded the proceedings as inappropriate for a con-

sideration of such rights of other parties, or had held that De Cordova had waived his rights of contribution.

The referee followed the established practice in other jurisdictions, by dividing the claimants into two classes and according those whose shares had been wrongfully hypothecated equities superior to those whose securities had been rightfully pledged. In re Lauzier-Wolcott & Co., supra; In re Ennis, supra; In re McIntyre, Pippey's Appeal, supra; In re Toole, supra; In re J. C. Wilson & Co., supra; In re Irving Whitehouse (C. C. A.) 293 F. 287; In re Walter J. Schmidt & Co., supra.

■ As the courts have frequently pointed out, no hard and fast rule can be laid down by which to measure the equities of the parties involved in the somewhat complicated situation resulting from the bankruptcy of a stockbroker. The general principle running through the cases seems to be that those customers who have left securities for safe-keeping, or have delivered them to the broker in order that he might sell them, or have delivered them upon express understanding that the securities are not to be repledged, have equities superior to those whose securities were rightfully rehypothecated; the courts apparently proceeding upon the theory that the broker, in wrongfully pledging the stock, has committed an act of conversion. As to the victims of this conversion, their securities are to be restored to them, so far as the surplus will permit, before any distribution can be made among the claimants of the second class.

The referee's order seems to be drawn in harmony with the doctrine of contribution and to recognize the priorities established in other jurisdictions.

■ The order puts the petitioners in the class of those whose claims are subordinated. It becomes necessary, therefore, to give consideration to the facts stated in the referee's certificate, with a view to determining whether the petitioners' securities were rightfully pledged. The petitioners have argued that the referee erred, not only in giving to them the status of inferior claimants, but also in refusing to receive testimony respecting the nature of the transactions which gave rise to a debit balance on the books of the bankrupt.

In proceedings to reclaim securities delivered to a broker to protect marginal accounts, or to recover their proceeds, the courts have not always agreed upon the criterion by which to determine whether the broker's pledge was rightful or wrongful. Some courts have held that, in the absence of special agreement, so long as the bankrupt,

as broker, fulfilled his obligation to the customer, he had the right to rehypothecate the securities pledged by him. In re Ennis, supra. While others have expressed the opinion that the broker's right to repledge is conditional upon the continued existence of the customer's debt. In re Green, supra; Lawrence v. Maxwell, 53 N. Y. 19; In re Archer, Harvey & Co., supra. Judge Rose says that any implied power to rehypothecate securities was, of course, limited to the amount of the bankrupt's advances to them. "Any pledging beyond that amount was wrongful, as was any hypothecation at all of the securities owned of the persons who were not indebted to the bankrupts."

The referee expressly finds that the broker entered into no agreement not to repledge, and, so far as the record before me discloses, there was no express agreement conferring that right; but it appears that the claimants were familiar with the custom prevailing among brokers, and that these securities were repledged with the knowledge and consent of the petitioners.

There is no evidence of any misappropriation or other violation of the broker's duty to these customers sufficient to render the rehypothecation unlawful, within the ruling of In re Ennis, supra, and according to the bankrupt's books the petitioners were indebted to him.

The next question is whether the petitioners should have had an opportunity to show that they did not, in fact, owe the bankrupt anything.

It appears from the referee's certificate that the petitioners offered to prove that what the books of the bankrupt purported to show as purchases and sales by the bankrupt were, in fact, not real purchases and sales, but were bucketing transactions, which would warrant a finding of fact that there was no real debit balance against the petitioners. The petitioners would argue from this fact, had they been allowed to establish it, that it was enough to render the rehypothecation wrongful. The referee regarded the proof as immaterial and ruled "that as a matter of law the bankrupt had the right on such accounts as these to repledge the securities of the petitioners regardless of whether the petitioners had a credit or debit balance with the bankrupt."

■ While I agree with the conclusions reached by the referee that, under the particular circumstances of the case presented, the fact that the broker and customer had been engaged in bucketing transactions would not render the rehypothecation unlawful, I would not feel like ruling, as a matter

of law, without important reservations, that a broker had the right to re-pledge securities of his customer regardless of whether the customer had a debit or credit balance, though the Massachusetts decisions would seem to so indicate. Furber v. Dane, supra; Boston Safe Deposit & Trust Co. v. Adams, 224 Mass. 442, 444, 113 N. E. 277, L. R. A. 1916F, 488. It is sufficient for the purposes of this case to agree with the referee that the petitioners would not have improved their case by showing that they had participated in transactions which were condemned by the statutes of Massachusetts. G. L. c. 137, §§ 4–7, and chapter 271, § 36.

One of the results of the referee's order is to confine the petitioners to their pro rata shares of any surplus available for distribution among those claimants whose securities were rightfully hypothecated, and passing on to the trustee in bankruptcy the pro rata shares of any such claimants who may not come forward with their claims.

This result would seem to be inconsistent with the theory, already noted, that the claimants to specific shares take them subject to the right of contribution. It might be said that under such circumstances the petitioners would be entitled to receive their securities upon satisfying the claims, duly presented, of other claimants in the same class, but the contrary opinion apparently prevails.

Claimants, failing to prove their claims to their pro rata shares, do not thereby enlarge the pro rata shares of those who do claim. In re Pierson (C. C. A.) 238 F. 142; In re J. C. Wilson et al., supra; In re Archer, Harvey & Co., supra. This result is reached by adopting the theory that those claimants who fail to insist upon their rights have elected thereby to give the general creditors the benefit of their shares in the available surplus. In re Archer, Harvey & Co., supra.

I have undertaken to deal with the referee's order in its several aspects and have reached the conclusion that it should be sustained. In arriving at this decision, I have been influenced by my conviction that in matters involving the complex relationship existing between stockbroker and customer the courts should aim to give uniformity to the rules to be applied. For that reason I have given careful consideration to the decisions rendered in other jurisdictions, dealing with the issues here involved. I agree with Judge Rose, who observed, in In re Archer, Harvey & Co., supra, that in these cases there is "more than the ordinary reason why a District Court should accept the view taken by the Circuit Court of Appeals of another circuit."

The order is confirmed.