WALTER H. FOSTER, trustee in bankruptcy, *vs.* COMMERCIAL NATIONAL BANK.

Suffolk.    January 14, 1924. — February 29, 1924.

Present: RUGG, C.J., DECOURCY, CROSBY, PIERCE, & CARROLL, JJ.

*Evidence*, Extrinsic affecting writing.  *Receipt.  Pledge.  Contract*, Construction, Validity.  *Bank.*

A receipt which does not take the form of a formal agreement is open to explanation and may be varied, contradicted or controlled by parol testimony.

In a suit in equity by a trustee in bankruptcy against a bank to require delivery to the plaintiff of certain Liberty bonds, it appeared that the bankrupt had been a wholesale dealer who had carried on his financial transactions through the defendant; that the defendant, in April, 1916, to secure advances made in such transactions, required the bankrupt to agree with it in writing that all securities deposited by him with it as collateral for any loan or indebtedness of him to it should also be held by it " as security for any other liability of the undersigned to said Bank, whether then existing or thereafter contracted " and that the bank should have a lien " upon all property of " the customer "of every description left with said Bank for safekeeping or otherwise, or coming into the hands of said Bank in any way, as security for any liability of " the customer " now existing or hereafter contracted; " and that " these presents constitute a continuing agreement, and apply to any and all future as well as to existing transactions between " the customer and the bank.    At a time when the customer was indebted to the bank, the customer subscribed through the bank for Liberty bonds of the first and second issues, paying therefor in instalments. Two years after the making of the agreement above described, when the customer had completed payments on these bonds, he gave to the bank a receipt for them and the bank then gave him a receipt for them ." for safekeeping," and they remained in the possession of the bank and were placed among collateral securities held by the bank.    *Held*, that

(1) Evidence was admissible tending to show conversations between the customer and officers of the bank explaining the transaction of the leaving of the bonds with the bank as a deposit of the bonds for col-

lateral, such evidence in no way varying the terms of the agreement made in April, 1916;

(2) The circumstances, that the bonds were not in existence at the time the agreement of April, 1916, was executed and delivered, did not affect the right of the bank to hold them in accordance with its provisions;

(3) Although by the terms of the receipt the bonds were held by the bank " for safekeeping," no overt act was required on the part of the defendant to change its position from that of bailee to that of pledgee, as the bonds became subject to the agreement as soon as they came into its possession;

(4) The agreement of April, 1916, was not void as against public policy.

BILL IN EQUITY, filed in the Superior Court on June 24, 1919, by the trustee in bankruptcy of Leonard C. Daniels to require the defendant to deliver to the plaintiff certain bonds alleged to have been the property of the bankrupt.

In the Superior Court, the suit was referred to a master. Material findings by the master are described in the opinion. The only exception to the master's report was by the plaintiff and it related to the admission of certain evidence described in the opinion.

The suit was heard by *McLaughlin*, J., by whose order there were entered an interlocutory decree overruling the exception and a final decree dismissing the bill. The plaintiff appealed from both decrees.

*G. W. Pike* (of New Hampshire), for the plaintiff.

*H. F. Knight*, for the defendant.

CROSBY, J. The plaintiff as trustee of the bankrupt estate of Leonard C. Daniels, brings this bill for an accounting in respect to certain discount transactions between the defendant bank and Daniels; and to compel the bank to turn over to the plaintiff certain Liberty bonds which the defendant claims to hold as security for certain indebtedness due to it from Daniels. The case was referred to a master, whose report shows that the evidence before him consisted of an agreed statement of facts and of oral evidence, neither of which is reported. The case is before us upon an appeal from an interlocutory decree overruling the exceptions to the master's report and confirming the report, and an appeal from a final decree dismissing the bill.

There is but little controversy between the parties respecting the material facts. In the year 1916 Daniels began business in Boston as a wholesale dealer in hay and grain, and in April of that year became a customer of the defendant bank, and applied to it to discount sight drafts which he was drawing upon parties to whom he had sold merchandise; these drafts were discounted by the bank from time to time and he used the proceeds to pay for goods he had purchased. Before any of the transactions were had, Daniels, at the request of the bank, executed and delivered to it an agreement (a copy of which is made a part of the master's report) which contained, among other provisions, the following: " 1. All securities deposited by the undersigned with said Bank, as collateral to any such loan or indebtedness of the undersigned to said Bank, shall also be held by said Bank as security for any other liability of the undersigned to said Bank, whether then existing or thereafter contracted; and said Bank shall also have a lien upon any balance of the deposit account of the undersigned with the said Bank existing from time to time, and upon all property of the undersigned of every description left with said Bank for safekeeping or otherwise, or coming into the hands of said Bank in any way, as security for any liability of the undersigned to said Bank now existing or hereafter contracted." It was also recited that " It is further agreed that these presents constitute a continuing agreement, applying to any and all future as well as to existing transactions between the undersigned and said Bank." The master found that Daniels thereafter was continually contingently liable to the bank by reason of discounting drafts which in October, 1918, amounted to $129,000.

In addition to the liability on account of drafts discounted, Daniels borrowed from the bank on August 16, 1918, $3,750, for which he gave a promissory note and deposited with the bank as collateral security therefor United States Third Liberty Loan Bonds of the face value of $5,000. Upon the renewal of this note the bonds, as collateral, were repledged and have from the time of the original loan remained in possession of the defendant. The new note (a copy of which

is printed in the master's report) was dated February 13, 1919, and is in the form of collateral notes commonly taken by banks and trust companies. On February 28, 1919, the bank also loaned to Daniels $350 for which he gave his promissory note payable March 3, 1919, but without collateral given at that time.

During the period when the federal government was soliciting subscriptions for Liberty loans, Daniels subscribed, through the defendant, for $300 of the first issue and $5,000 of the second issue. They were paid for by him in instalments by checks drawn on his account in the bank, and the bonds or certificates therefor were kept in the possession of the bank. On March 18, 1918, he had completed the payments for the bonds, and the bank requested him to give it a receipt for the $5,300 of bonds so purchased; he gave two receipts, one for $300 for the bonds of the first issue, and one for $5,000 for the bonds of the second issue. At the same time the defendant gave him a receipt for the bonds " for safe keeping," and they remained in the possession of the bank. As soon as payments for each had been completed the bonds were put in envelopes, which were placed with others containing collateral securities held by the bank.

On March 11, 1919, an involuntary petition in bankruptcy was filed against Daniels, and on April 1, 1919, he was adjudged bankrupt. The plaintiff has not argued that he is entitled to recover the $5,000 of bonds held as collateral security for payment of the note for $3,750, or for any other indebtedness due to the bank. It is plain that such a contention could not be successfully maintained. He does contend, however, that the $300 of bonds of the first issue and the $5,000 of bonds of the second issue were left with the defendant for safe-keeping, and that it is not entitled to apply them to any indebtedness of Daniels; and that as his trustee in bankruptcy the plaintiff is entitled to receive them as assets of the estate.

The plaintiff excepted to the admission by the master of conversations between Daniels and officers of the bank at the time the receipts were given, and at later times when

there were conversations relative to collateral, for the reason " that such conversations could not be received to vary the terms of the written contract dated April 24, 1916, . . . and the receipt given by the bank dated March 18, 1918." The master states that the cashier of the defendant testified that on the day the receipts were given he had a conversation with Daniels in which " it was stated that the bank was to hold them [the bonds] as ' collateral ' or ' security ' or as ' safeguard.' Daniels said that, as the bank was to keep them in its possession, he wanted something to show that it had them and the cashier replied that he would give a receipt." The master also found that in the fall of 1918, officers of the bank made frequent requests of Daniels for additional security and that he replied in substance " ' You have my Liberty bonds ' or ' my bonds, up there. There is nothing for you to worry about ' and ' With the stuff you have there now, what you have ought to prove sufficient; ' " and that on or about February 28, 1919, Daniels told the president of the bank that he was going to Chicago to arrange a meeting of his creditors and wanted to borrow some money, and upon being asked by the president if he could give additional collateral he replied " I haven't any. You have all the property, all the collateral I have, now." This evidence was admissible to explain the receipts and to show, as the master found, that Daniels and the officers of the defendant understood that the bank was holding the bonds in question as collateral under the agreement. It is well settled that a receipt is open to explanation and may be varied, contradicted or controlled by parol testimony. *Brooks* v. *White,* 2 Met. 283. *Briggs* v. *Call,* 5 Met. 504. We are unable to find that these conversations tended to vary the terms of the agreement made in April, 1916, which agreement entitled the defendant to a lien on property left for safe-keeping. The exception to the admission of this evidence must be overruled.

If the contention that the evidence was inadmissible were sound it would be immaterial, in view of the finding by the master that the agreement was never discharged or waived, for the reason that the defendant was entitled under

the agreement to hold the bonds when left " for safekeeping or otherwise." The total liabilities of Daniels to the bank, exclusive of interest, amounted to a sum in excess of the value of all the bonds delivered to it by him; and it is found that at the time of the adjudication in bankruptcy there had been no change in the conditions under which the bonds were held by the bank. The circumstance that the bonds were not in existence at the time the agreement of April 24, 1916, was executed and delivered by Daniels does not affect the right of the defendant to hold them in accordance with its provisions.

Although by the terms of the receipt the bonds were held for safe-keeping, no overt act was required on the part of the defendant to change its position from that of bailee to pledgee, as the bonds became subject to the agreement as soon as they came into the possession of the defendant. The conversations between Daniels and the officers of the bank above referred to plainly show that it was understood by them that these bonds were being held as collateral under the agreement.

There is no intimation that Daniels was induced to execute the contract by reason of any deception practiced upon him by the defendant or its officers, or that any fraud was committed by them. It was not void as against public policy but was one which the defendant as a banking institution could lawfully require a customer of the bank to execute for its protection against loss. The plaintiff has cited no case to the contrary and we have found none. *Nesmith* v. *Washington Bank,* 6 Pick. 324, cited by him is not pertinent to the contract in the case at bar. While a bank has a general lien upon all securities in its possession belonging to its customer for the balance due on general account, yet the right to retain such securities for a balance due may be controlled by any special agreement which shows that such was not intended by the parties. If in the absence of any agreement these bonds had been left with the defendant merely for safe-keeping, it would not have had a lien thereon for the balance due from Daniels. *Neponset Bank* v. *Leland,* 5 Met. 259. *Furber* v. *Dane,* 203 Mass. 108, 117.

*Reynes* v. *Dumont*, 130 U. S. 354.    *Hanover National Bank of New York* v. *Suddath*, 215 U. S. 110.    *Duncan* v. *Brennan*, 83 N. Y. 487, 491.    But in the case at bar the agreement specifically provides that the bank shall " have a lien . . . upon all property of the undersigned of every description left with said Bank for safekeeping or otherwise," and, it not being unlawful, the defendant is entitled to the bonds to be applied in satisfaction of the indebtedness of Daniels to it.

It follows that the interlocutory decree overruling the exceptions to the master's report and confirming the report, and the final decree dismissing the bill with costs, should be affirmed.

*So ordered.*